## UNITED STATES ET AL. *v.* FLORIDA EAST COAST RAILWAY CO. ET AL.

No. 70–279.  Argued December 7, 1972—Decided January 22, 1973

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which STEWART, J., joined, *post,* p. 246.  POWELL, J., took no part in the consideration or decision of the case.

*Samuel Huntington* argued the cause for the United States et al.  With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Kauper, Fritz R. Kahn,* and *Leonard S. Goodman.*

*A. Alvis Layne* argued the cause for appellee Florida East Coast Railway Co.  With him on the brief was

*Walter G. Arnold. Richard A. Hollander* argued the cause and filed a brief for appellee Seaboard Coast Line Railroad Co.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Appellees, two railroad companies, brought this action in the District Court for the Middle District of Florida to set aside the incentive per diem rates established by appellant Interstate Commerce Commission in a rulemaking proceeding. *Incentive Per Diem Charges—1968, Ex parte* No. 252 (Sub-No. 1), 337 I. C. C. 217 (1970). They challenged the order of the Commission on both substantive and procedural grounds. The District Court sustained appellees' position that the Commission had failed to comply with the applicable provisions of the Administrative Procedure Act, 5 U. S. C. § 551 *et seq.,* and therefore set aside the order without dealing with the railroads' other contentions. The District Court held that the language of § 1 (14)(a) [1] of the Interstate Commerce

---

[1] Section 1 (14) (a) provides:

"The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices. In fixing such compensation to be paid for the use of any type of freight car, the Commission shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and shall, on the basis of such consideration, determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased

Act, 24 Stat. 379, as amended, 49 U. S. C. § 1 (14)(a), required the Commission in a proceeding such as this to act in accordance with the Administrative Procedure Act, 5 U. S. C. § 556 (d), and that the Commission's determination to receive submissions from the appellees only in written form was a violation of that section because the appellees were "prejudiced" by that determination within the meaning of that section.

Following our decision last Term in *United States* v. *Allegheny-Ludlum Steel Corp.*, 406 U. S. 742 (1972), we noted probable jurisdiction, 407 U. S. 908 (1972), and requested the parties to brief the question of whether the Commission's proceeding was governed by 5 U. S. C. § 553,[2]

by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate and may exempt from the compensation to be paid by any group of carriers such incentive element or elements if the Commission finds it to be in the national interest."

[2] "§ 553. Rule making.

"(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

"(1) a military or foreign affairs function of the United States; or

"(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

"(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

"(1) a statement of the time, place, and nature of public rule making proceedings;

"(2) reference to the legal authority under which the rule is proposed; and

"(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

or by §§ 556 [3] and 557,[4] of the Administrative Procedure Act. We here decide that the Commission's proceeding was governed only by § 553 of that Act,

---

Except when notice or hearing is required by statute, this subsection does not apply—

"(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

"(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

"(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

"(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

"(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

"(2) interpretative rules and statements of policy; or

"(3) as otherwise provided by the agency for good cause found and published with the rule.

"(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."

[3] "§ 556. Hearings; presiding employees; powers and duties; burden of proof; evidence; record as basis of decision.

"(a) This section applies, according to the provisions thereof, to hearings required by section 553 or 554 of this title to be conducted in accordance with this section.

"(b) There shall preside at the taking of evidence—

"(1) the agency;

"(2) one or more members of the body which comprises the agency; or

"(3) one or more hearing examiners appointed under section 3105 of this title.

"This subchapter does not supersede the conduct of specified classes

and that appellees received the "hearing" required by § 1 (14) (a) of the Interstate Commerce Act. We, therefore, reverse the judgment of the District Court and

---

of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute. The functions of presiding employees and of employees participating in decisions in accordance with section 557 of this title shall be conducted in an impartial manner. A presiding or participating employee may at any time disqualify himself. On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.

"(c) Subject to published rules of the agency and within its powers, employees presiding at hearings may—

"(1) administer oaths and affirmations;

"(2) issue subpenas authorized by law;

"(3) rule on offers of proof and receive relevant evidence;

"(4) take depositions or have depositions taken when the ends of justice would be served;

"(5) regulate the course of the hearing;

"(6) hold conferences for the settlement or simplication of the issues by consent of the parties;

"(7) dispose of procedural requests or similar matters;

"(8) make or recommend decisions in accordance with section 557 of this title; and

"(9) take other action authorized by agency rule consistent with this subchapter.

"(d) Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence. A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced

remand the case to that court for further consideration of appellees' other contentions that were raised there, but which we do not decide.

---

thereby, adopt procedures for the submission of all or part of the evidence in written form.

"(e) The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision in accordance with section 557 of this title and, on payment of lawfully prescribed costs, shall be made available to the parties. When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary."

[4] "§ 557. Initial decisions; conclusiveness; review by agency; submissions by parties; contents of decisions; record.

"(a) This section applies, according to the provisions thereof, when a hearing is required to be conducted in accordance with section 556 of this title.

"(b) When the agency did not preside at the reception of the evidence, the presiding employee or, in cases not subject to section 554 (d) of this title, an employee qualified to preside at hearings pursuant to section 556 of this title, shall initially decide the case unless the agency requires, either in specific cases or by general rule, the entire record to be certified to it for decision. When the presiding employee makes an initial decision, that decision then becomes the decision of the agency without further proceedings unless there is an appeal to, or review on motion of, the agency within time provided by rule. On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule. When the agency makes the decision without having presided at the reception of the evidence, the presiding employee or an employee qualified to preside at hearings pursuant to section 556 of this title shall first recommend a decision, except that in rule making or determining applications for initial licenses—

"(1) instead thereof the agency may issue a tentative decision or one of its responsible employees may recommend a decision; or

"(2) this procedure may be omitted in a case in which the agency finds on the record that due and timely execution of its functions imperatively and unavoidably so requires.

"(c) Before a recommended, initial, or tentative decision, or a decision on agency review of the decision of subordinate employees, the

I. Background of Chronic Freight Car Shortages

This case arises from the factual background of a chronic freight-car shortage on the Nation's railroads, which we described in *United States* v. *Allegheny-Ludlum Steel Corp., supra.* Judge Simpson, writing for the District Court in this case, noted that "[f]or a number of years portions of the nation have been plagued with seasonal shortages of freight cars in which to ship goods." 322 F. Supp. 725, 726 (MD Fla. 1971). Judge Friendly, writing for a three-judge District Court in the Eastern District of New York in the related case of *Long Island R. Co.* v. *United States,* 318 F. Supp. 490, 491 (EDNY 1970), described the Commission's order as "the latest chapter in a long history of freight-car shortages in certain regions and seasons and of attempts to ease them." Congressional concern for the problem was manifested in the enactment in 1966 of an amendment to § 1 (14)(a) of the Interstate Commerce Act, enlarging the Commission's authority to prescribe per diem charges for the use by one railroad of freight cars owned by another. Pub. L. 89–430, 80 Stat. 168. The Senate

---

parties are entitled to a reasonable opportunity to submit for the consideration of the employees participating in the decisions—

"(1) proposed findings and conclusions; or

"(2) exceptions to the decisions or recommended decisions of subordinate employees or to tentative agency decisions; and

"(3) supporting reasons for the exceptions or proposed findings or conclusions.

"The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of—

"(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record; and

"(B) the appropriate rule, order, sanction, relief, or denial thereof."

Committee on Commerce stated in its report accompanying this legislation:

"Car shortages, which once were confined to the Midwest during harvest seasons, have become increasingly more frequent, more severe, and nationwide in scope as the national freight car supply has plummeted." S. Rep. No. 386, 89th Cong., 1st Sess., 1–2.

The Commission in 1966 commenced an investigation, *Ex parte* No. 252, Incentive Per Diem Charges, "to determine whether information presently available warranted the establishment of an incentive element increase, on an interim basis, to apply pending further study and investigation." 332 I. C. C. 11, 12 (1967). Statements of position were received from the Commission staff and a number of railroads. Hearings were conducted at which witnesses were examined. In October 1967, the Commission rendered a decision discontinuing the earlier proceeding, but announcing a program of further investigation into the general subject.

In December 1967, the Commission initiated the rulemaking procedure giving rise to the order that appellees here challenge. It directed Class I and Class II linehaul railroads to compile and report detailed information with respect to freight-car demand and supply at numerous sample stations for selected days of the week during 12 four-week periods, beginning January 29, 1968.

Some of the affected railroads voiced questions about the proposed study or requested modification in the study procedures outlined by the Commission in its notice of proposed rulemaking. In response to petitions setting forth these carriers' views, the Commission staff held an informal conference in April 1968, at which the objections and proposed modifications were discussed.

Twenty railroads, including appellee Seaboard, were represented at this conference, at which the Commission's staff sought to answer questions about reporting methods to accommodate individual circumstances of particular railroads. The conference adjourned on a note that undoubtedly left the impression that hearings would be held at some future date. A detailed report of the conference was sent to all parties to the proceeding before the Commission.

The results of the information thus collected were analyzed and presented to Congress by the Commission during a hearing before the Subcommittee on Surface Transportation of the Senate Committee on Commerce in May 1969. Members of the Subcommittee expressed dissatisfaction with the Commission's slow pace in exercising the authority that had been conferred upon it by the 1966 Amendments to the Interstate Commerce Act. Judge Simpson in his opinion for the District Court said:

> "Members of the Senate Subcommittee on Surface Transportation expressed considerable dissatisfaction with the Commission's apparent inability to take effective steps toward eliminating the national shortage of freight cars. Comments were general that the Commission was conducting too many hearings and taking too little action. Senators pressed for more action and less talk, but Commission counsel expressed doubt respecting the Commission's statutory power to act without additional hearings." 322 F. Supp., at 727.

Judge Friendly, describing the same event in *Long Island R. Co.* v. *United States, supra,* said:

> "To say that the presentation was not received with enthusiasm would be a considerable understatement. Senators voiced displeasure at the Com-

mission's long delay at taking action under the 1966 amendment, engaged in some merriment over what was regarded as an unintelligible discussion of methodology . . . and expressed doubt about the need for a hearing . . . . But the Commission's general counsel insisted that a hearing was needed . . . and the Chairman of the Commission agreed . . . ." 318 F. Supp., at 494.

The Commission, now apparently imbued with a new sense of mission, issued in December 1969 an interim report announcing its tentative decision to adopt incentive per diem charges on standard boxcars based on the information compiled by the railroads. The substantive decision reached by the Commission was that so-called "incentive" per diem charges should be paid by any railroad using on its lines a standard boxcar owned by another railroad. Before the enactment of the 1966 amendment to the Interstate Commerce Act, it was generally thought that the Commission's authority to fix per diem payments for freight car use was limited to setting an amount that reflected fair return on investment for the owning railroad, without any regard being had for the desirability of prompt return to the owning line or for the encouragement of additional purchases of freight cars by the railroads as a method of investing capital. The Commission concluded, however, that in view of the 1966 amendment it could impose additional "incentive" per diem charges to spur prompt return of existing cars and to make acquisition of new cars financially attractive to the railroads. It did so by means of a proposed schedule that established such charges on an across-the-board basis for all common carriers by railroads subject to the Interstate Commerce Act. Embodied in the report was a proposed rule adopting the Commission's tentative conclusions and a notice

to the railroads to file statements of position within 60 days, couched in the following language:

> "That verified statements of facts, briefs, and statements of position respecting the tentative conclusions reached in the said interim report, the rules and regulations proposed in the appendix to this order, and any other pertinent matter, are hereby invited to be submitted pursuant to the filing schedule set forth below by an interested person whether or not such person is already a party to this proceeding.
>
> .    .    .    .    .
>
> "That any party requesting oral hearing shall set forth with specificity the need therefor and the evidence to be adduced." 337 I. C. C. 183, 213.

Both appellee railroads filed statements objecting to the Commission's proposal and requesting an oral hearing, as did numerous other railroads. In April 1970, the Commission, without having held further "hearings," issued a supplemental report making some modifications in the tentative conclusions earlier reached, but overruling *in toto* the requests of appellees.

The District Court held that in so doing the Commission violated § 556 (d) of the Administrative Procedure Act, and it was on this basis that it set aside the order of the Commission.

II. APPLICABILITY OF ADMINISTRATIVE PROCEDURE ACT

In *United States* v. *Allegheny-Ludlum Steel Corp., supra,* we held that the language of § 1 (14)(a) of the Interstate Commerce Act authorizing the Commission to act "after hearing" was not the equivalent of a requirement that a rule be made "on the record after opportunity for an agency hearing" as the latter term is used in § 553 (c) of the Administrative Procedure Act. Since the 1966 amendment to § 1 (14)(a), under which

the Commission was here proceeding, does not by its terms add to the hearing requirement contained in the earlier language, the same result should obtain here unless that amendment contains language that is tantamount to such a requirement. Appellees contend that such language is found in the provisions of that Act requiring that:

> "[T]he Commission shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and shall, on the basis of such consideration, determine whether compensation should be computed . . . ."

While this language is undoubtedly a mandate to the Commission to consider the factors there set forth in reaching any conclusion as to imposition of per diem incentive charges, it adds to the hearing requirements of the section neither expressly nor by implication. We know of no reason to think that an administrative agency in reaching a decision cannot accord consideration to factors such as those set forth in the 1966 amendment by means other than a trial-type hearing or the presentation of oral argument by the affected parties. Congress by that amendment specified necessary components of the ultimate decision, but it did not specify the method by which the Commission should acquire information about those components.[5]

---

[5] The Court of Appeals for the Ninth Circuit reached a result similar to that which we reach, in *Pacific Coast European Conference* v. *United States,* 350 F. 2d 197 (1965). Construing the authority of the Federal Maritime Commission under § 14b of the Shipping Act, 1916, as amended, 46 U. S. C. § 813a, that court observed that "[t]he authority of the Commission to permit such contracts was limited by requiring that the contracts in eight specified respects meet the congressional judgment as to what they should include." 350 F. 2d, at 201. Notwithstand-

Both of the district courts that reviewed this order of the Commission concluded that its proceedings were governed by the stricter requirements of §§ 556 and 557 of the Administrative Procedure Act, rather than by the provisions of § 553 alone.[6] The conclusion of the District Court for the Middle District of Florida, which we here review, was based on the assumption that the language in § 1 (14)(a) of the Interstate Commerce Act requiring rulemaking under that section to be done "after hearing" was the equivalent of a statutory requirement that the rule "be made on the record after opportunity for an agency hearing." Such an assump-

---

ing these explicit directions that particular factors be considered by the Commission in reaching its decision, the court held that the statute's requirements of "notice and hearing" were not sufficient to bring into play the provisions of §§ 556 and 557 of the Administrative Procedure Act.

[6] Both district court opinions were handed down before our decision in *United States* v. *Allegheny-Ludlum Steel Corp.*, 406 U. S. 742 (1972), and it appears from the record before us that the Government in those courts did not really contest the proposition that the Commission's proceedings were governed by the stricter standards of §§ 556 and 557.

The dissenting opinion of MR. JUSTICE DOUGLAS relies in part on indications by the Commission that it proposed to apply the more stringent standards of §§ 556 and 557 of the Administrative Procedure Act to these proceedings. This Act is not legislation that the Interstate Commerce Commission, or any other single agency, has primary responsibility for administering. An agency interpretation involving, at least in part, the provisions of that Act does not carry the weight, in ascertaining the intent of Congress, that an interpretation by an agency "charged with the responsibility" of administering a particular statute does. See *United States* v. *American Trucking Assns.*, 310 U. S. 534 (1940); *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294 (1933). Moreover, since any agency is free under the Act to accord litigants appearing before it more procedural rights than the Act requires, the fact that an agency may choose to proceed under §§ 556 and 557 does not carry the necessary implication that the agency felt it was required to do so.

tion is inconsistent with our decision in *Allegheny-Ludlum, supra*.

The District Court for the Eastern District of New York reached the same conclusion by a somewhat different line of reasoning. That court felt that because § 1 (14)(a) of the Interstate Commerce Act had required a "hearing," and because that section was originally enacted in 1917, Congress was probably thinking in terms of a "hearing" such as that described in the opinion of this Court in the roughly contemporaneous case of *ICC* v. *Louisville & Nashville R. Co.*, 227 U. S. 88, 93 (1913). The ingredients of the "hearing" were there said to be that "[a]ll parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal." Combining this view of congressional understanding of the term "hearing" with comments by the Chairman of the Commission at the time of the adoption of the 1966 legislation regarding the necessity for "hearings," that court concluded that Congress had, in effect, required that these proceedings be "on the record after opportunity for an agency hearing" within the meaning of § 553 (c) of the Administrative Procedure Act.

Insofar as this conclusion is grounded on the belief that the language "after hearing" of § 1 (14)(a), without more, would trigger the applicability of §§ 556 and 557, it, too, is contrary to our decision in *Allegheny-Ludlum, supra*. The District Court observed that it was "rather hard to believe that the last sentence of § 553 (c) was directed only to the few legislative sports where the words 'on the record' or their equivalent had found their way into the statute book." 318 F. Supp., at 496. This is, however, the language which Congress used, and since there are statutes on the books that do use these

very words, see, *e. g.,* the Fulbright Amendment to the Walsh-Healey Act, 41 U. S. C. § 43a, and 21 U. S. C. § 371 (e)(3), the regulations provision of the Food and Drug Act, adherence to that language cannot be said to render the provision nugatory or ineffectual. We recognized in *Allegheny-Ludlum* that the actual words "on the record" and "after . . . hearing" used in § 553 were not words of art, and that other statutory language having the same meaning could trigger the provisions of §§ 556 and 557 in rulemaking proceedings. But we adhere to our conclusion, expressed in that case, that the phrase "after hearing" in § 1 (14)(a) of the Interstate Commerce Act does not have such an effect.

III. "HEARING" REQUIREMENT OF § 1 (14)(a) OF THE INTERSTATE COMMERCE ACT

Inextricably intertwined with the hearing requirement of the Administrative Procedure Act in this case is the meaning to be given to the language "after hearing" in § 1 (14)(a) of the Interstate Commerce Act. Appellees, both here and in the court below, contend that the Commission procedure here fell short of that mandated by the "hearing" requirement of § 1 (14)(a), even though it may have satisfied § 553 of the Administrative Procedure Act. The Administrative Procedure Act states that none of its provisions "limit or repeal additional requirements imposed by statute or otherwise recognized by law." 5 U. S. C. § 559. Thus, even though the Commission was not required to comply with §§ 556 and 557 of that Act, it was required to accord the "hearing" specified in § 1 (14)(a) of the Interstate Commerce Act. Though the District Court did not pass on this contention, it is so closely related to the claim based on the Administrative Procedure Act that we proceed to decide it now.

If we were to agree with the reasoning of the District Court for the Eastern District of New York with respect to the type of hearing required by the Interstate Commerce Act, the Commission's action might well violate those requirements, even though it was consistent with the requirements of the Administrative Procedure Act.

The term "hearing" in its legal context undoubtedly has a host of meanings.[7] Its meaning undoubtedly will vary, depending on whether it is used in the context of a rulemaking-type proceeding or in the context of a proceeding devoted to the adjudication of particular disputed facts. It is by no means apparent what the drafters of the Esch Car Service Act of 1917, 40 Stat. 101, which became the first part of § 1 (14)(a) of the Interstate Commerce Act, meant by the term. Such an intent would surely be an ephemeral one if, indeed, Congress in 1917 had in mind anything more specific than the language it actually used, for none of the parties refer to any legislative history that would shed light on the intended meaning of the words "after hearing." What is apparent, though, is that the term was used in granting authority to the Commission to make rules and regulations of a prospective nature.

Appellees refer us to testimony of the Chairman of the Commission to the effect that if the added authority ultimately contained in the 1966 amendment were enacted, the Commission would proceed with "great caution" in imposing incentive per diem rates, and to statements of both Commission personnel and Members of Congress as to the necessity for a "hearing" before Commission action. Certainly, the lapse of time of more than three years between the enactment of the 1966 amendment and the Commission's issuance of its tenta-

---

[7] See 1 K. Davis, Administrative Law Treatise, § 6.05 (1958).

tive conclusions cannot be said to evidence any lack of caution on the part of that body. Nor do generalized references to the necessity for a hearing advance our inquiry, since the statute by its terms requires a "hearing"; the more precise inquiry of whether the hearing requirements necessarily include submission of oral testimony, cross-examination, or oral arguments is not resolved by such comments as these.

Under these circumstances, confronted with a grant of substantive authority made after the Administrative Procedure Act was enacted,[8] we think that reference to that Act, in which Congress devoted itself exclusively to questions such as the nature and scope of hearings, is a satisfactory basis for determining what is meant by the term "hearing" used in another statute. Turning to that Act, we are convinced that the term "hearing" as used therein does not necessarily embrace either the right to present evidence orally and to cross-examine opposing witnesses, or the right to present oral argument to the agency's decisionmaker.

Section 553 excepts from its requirements rulemaking devoted to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," and rulemaking "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." This exception does not apply, however, "when notice or hearing is required by statute"; in those cases, even though interpretative rulemaking be involved, the requirements of § 553 apply. But since these require-

---

[8] The Interstate Commerce Act was amended in May 1966; the 1946 Administrative Procedure Act was repealed by Act of Sept. 6, 1966, 80 Stat. 378, which revised, codified, and enacted Title 5 of the United States Code, but the section detailing the procedures to be used in rulemaking is substantially similar to the original provision in the 1946 Administrative Procedure Act. See § 4 (b), 60 Stat. 238.

ments themselves do not mandate any oral presentation, see *Allegheny-Ludlum, supra,* it cannot be doubted that a statute that requires a "hearing" prior to rulemaking may in some circumstances be satisfied by procedures that meet only the standards of § 553. The Court's opinion in *FPC* v. *Texaco Inc.,* 377 U. S. 33 (1964), supports such a broad definition of the term "hearing."

Similarly, even where the statute requires that the rulemaking procedure take place "on the record after opportunity for an agency hearing," thus triggering the applicability of § 556, subsection (d) provides that the agency may proceed by the submission of all or part of the evidence in written form if a party will not be "prejudiced thereby." Again, the Act makes it plain that a specific statutory mandate that the proceedings take place on the record after hearing may be satisfied in some circumstances by evidentiary submission in written form only.

We think this treatment of the term "hearing" in the Administrative Procedure Act affords a sufficient basis for concluding that the requirement of a "hearing" contained in § 1 (14)(a), in a situation where the Commission was acting under the 1966 statutory rulemaking authority that Congress had conferred upon it, did not by its own force require the Commission either to hear oral testimony, to permit cross-examination of Commission witnesses, or to hear oral argument. Here, the Commission promulgated a tentative draft of an order, and accorded all interested parties 60 days in which to file statements of position, submissions of evidence, and other relevant observations. The parties had fair notice of exactly what the Commission proposed to do, and were given an opportunity to comment, to object, or to make some other form of written submission. The final order of the Commission indicates that it gave consideration to the statements of the two appellees here.

Given the "open-ended" nature of the proceedings, and the Commission's announced willingness to consider proposals for modification after operating experience had been acquired, we think the hearing requirement of § 1 (14)(a) of the Act was met.

Appellee railroads cite a number of our previous decisions dealing in some manner with the right to a hearing in an administrative proceeding. Although appellees have asserted no claim of constitutional deprivation in this proceeding, some of the cases they rely upon expressly speak in constitutional terms, while others are less than clear as to whether they depend upon the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution, or upon generalized principles of administrative law formulated prior to the adoption of the Administrative Procedure Act.

*Morgan* v. *United States,* 304 U. S. 1 (1938), is cited in support of appellees' contention that the Commission's proceedings were fatally deficient. That opinion describes the proceedings there involved as "quasi-judicial," *id.,* at 14, and thus presumably distinct from a rulemaking proceeding such as that engaged in by the Commission here. But since the order of the Secretary of Agriculture there challenged did involve a form of ratemaking, the case bears enough resemblance to the facts of this case to warrant further examination of appellees' contention. The administrative procedure in *Morgan* was held to be defective primarily because the persons who were to be affected by the Secretary's order were found not to have been adequately apprised of what the Secretary proposed to do prior to the time that he actually did it. Illustrative of the Court's reasoning is the following passage from the opinion:

> "The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party

and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command." *Id.*, at 18–19.[9]

The proceedings before the Secretary of Agriculture had been initiated by a notice of inquiry into the reasonableness of the rates in question, and the individuals being regulated suffered throughout the proceeding from its essential formlessness. The Court concluded that this formlessness denied the individuals subject to regulation the "full hearing" that the statute had provided.

Assuming, *arguendo*, that the statutory term "full hearing" does not differ significantly from the hearing requirement of § 1 (14) (a), we do not believe that the proceedings of the Interstate Commerce Commission before us suffer from the defect found to be fatal in *Morgan*. Though the initial notice of the proceeding by no means set out in detail what the Commission proposed to do, its tentative conclusions and order of December 1969, could scarcely have been more explicit or detailed. All interested parties were given 60 days following the issuance of these tentative findings and order in which to make appropriate objections. Appellees were "fairly advised" of exactly what the Commission proposed to do sufficiently in advance of the entry of the final order to give them adequate time to

---

[9] This same language was cited with approval by the Court in *Willner* v. *Committee on Character*, 373 U. S. 96, 105 (1963), in which it was held that an applicant for admission to the bar could not be denied such admission on the basis of *ex parte* statements of others whom he had not been afforded an opportunity to cross-examine.

244

formulate and to present objections to the Commission's proposal. *Morgan,* therefore, does not aid appellees.

*ICC* v. *Louisville & Nashville R. Co.,* 227 U. S. 88 (1913), involved what the Court there described as a "quasi-judicial" proceeding of a quite different nature from the one we review here. The provisions of the Interstate Commerce Act, 24 Stat. 379, as amended, and of the Hepburn Act, 34 Stat. 584, in effect at the time that case was decided, left to the railroad carriers the "primary right to make rates," 227 U. S., at 92, but granted to the Commission the authority to set them aside, if after hearing, they were shown to be unreasonable. The proceeding before the Commission in that case had been instituted by the New Orleans Board of Trade complaint that certain class and commodity rates charged by the Louisville & Nashville Railroad from New Orleans to other points were unfair, unreasonable, and discriminatory. 227 U. S., at 90. The type of proceeding there, in which the Commission adjudicated a complaint by a shipper that specified rates set by a carrier were unreasonable, was sufficiently different from the nationwide incentive payments ordered to be made by all railroads in this proceeding so as to make the *Louisville & Nashville* opinion inapplicable in the case presently before us.

The basic distinction between rulemaking and adjudication is illustrated by this Court's treatment of two related cases under the Due Process Clause of the Fourteenth Amendment. In *Londoner* v. *Denver,* cited in oral argument by appellees, 210 U. S. 373 (1908), the Court held that due process had not been accorded a landowner who objected to the amount assessed against his land as its share of the benefit resulting from the paving of a street. Local procedure had accorded him the right to file a written complaint and objection, but not to be heard orally. This Court held that due process

of law required that he "have the right to support his allegations by argument however brief, and, if need be, by proof, however informal." *Id.*, at 386. But in the later case of *Bi-Metallic Investment Co.* v. *State Board of Equalization,* 239 U. S. 441 (1915), the Court held that no hearing at all was constitutionally required prior to a decision by state tax officers in Colorado to increase the valuation of all taxable property in Denver by a substantial percentage. The Court distinguished *Londoner* by stating that there a small number of persons "were exceptionally affected, in each case upon individual grounds." *Id.*, at 446.

Later decisions have continued to observe the distinction adverted to in *Bi-Metallic Investment Co., supra.* In *Ohio Bell Telephone Co.* v. *Public Utilities Comm'n,* 301 U. S. 292, 304–305 (1937), the Court noted the fact that the administrative proceeding there involved was designed to require the utility to refund previously collected rate charges. The Court held that in such a proceeding the agency could not, consistently with due process, act on the basis of undisclosed evidence that was never made a part of the record before the agency. The case is thus more akin to *Louisville & Nashville R. Co., supra,* than it is to this case. *FCC* v. *WJR,* 337 U. S. 265 (1949), established that there was no across-the-board constitutional right to oral argument in every administrative proceeding regardless of its nature. While the line dividing them may not always be a bright one, these decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other.

Here, the incentive payments proposed by the Commission in its tentative order, and later adopted in its

final order, were applicable across the board to all of the common carriers by railroad subject to the Interstate Commerce Act. No effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances. Indeed, one of the objections of appellee Florida East Coast was that it and other terminating carriers should have been treated differently from the generality of the railroads. But the fact that the order may in its effects have been thought more disadvantageous by some railroads than by others does not change its generalized nature. Though the Commission obviously relied on factual inferences as a basis for its order, the source of these factual inferences was apparent to anyone who read the order of December 1969. The factual inferences were used in the formulation of a basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts.

The Commission's procedure satisfied both the provisions of § 1 (14) (a) of the Interstate Commerce Act and of the Administrative Procedure Act, and were not inconsistent with prior decisions of this Court. We, therefore, reverse the judgment of the District Court, and remand the case so that it may consider those contentions of the parties that are not disposed of by this opinion.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE STEWART concurs, dissenting.

The present decision makes a sharp break with traditional concepts of procedural due process. The Commission order under attack is tantamount to a rate order. Charges are fixed that nonowning railroads must pay

owning railroads for boxcars of the latter that are on the tracks of the former. These charges are effective only during the months of September through February, the period of greatest boxcar use. For example, the charge for a boxcar that costs from $15,000 to $17,000 and that is five years of age or younger amounts to $5.19 a day. Boxcars costing between $39,000 and $41,000 and that are five years of age or younger cost the non-owning railroad $12.98 a day. The fees or rates charged decrease as the ages of the boxcars lengthen. 49 CFR § 1036.2. This is the imposition on carriers by administrative fiat of a new financial liability. I do not believe it is within our traditional concepts of due process to allow an administrative agency to saddle anyone with a new rate, charge, or fee without a full hearing that includes the right to present oral testimony, cross-examine witnesses, and present oral argument. That is required by the Administrative Procedure Act, 5 U. S. C. § 556 (d); § 556 (a) states that § 556 applies to hearings required by § 553. Section 553 (c) provides that § 556 applies "[w]hen rules are required by statute to be made on the record after opportunity for an agency hearing." A hearing under § 1 (14)(a) of the Interstate Commerce Act fixing rates, charges, or fees is certainly adjudicatory, not legislative in the customary sense.

The question is whether the Interstate Commerce Commission procedures used in this rate case "for the submission of . . . evidence in written form" avoided prejudice to the appellees so as to comport with the requirements of the Administrative Procedure Act.[1] The Government appeals from the District Court's order

---

[1] 5 U. S. C. § 556 (d) provides that a "sanction may not be imposed" without a full hearing, including cross-examination. But § 556 (d) makes an exception, which I submit is not relevant here. It provides: "In rule making . . . an agency may, *when a party will not be prejudiced thereby,* adopt procedures for the submission of all or part of the evidence in written form." (Emphasis added.)

remanding this case to the Commission for further proceedings on the incentive per diem rates to be paid by the appellee railroads for the standard boxcars they use.

In 1966, Congress amended § 1 (14)(a) of the Interstate Commerce Act to require that the Commission investigate the use of methods of incentive compensation to alleviate any shortage of freight cars "and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense." 49 U. S. C. § 1 (14)(a). While the Commission was given the discretion to exempt carriers from incentive payments "in the national interest," it was denied the power to "make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate . . . ." *Ibid.*

The Commission's initial investigation under this authority (31 Fed. Reg. 9240) was terminated without action because it "produced no reliable information respecting the quantum of interim incentive charge necessary to meet the statutory standards." 332 I. C. C. 11, 16. A subsequent study of boxcar supply-and-demand conditions (32 Fed. Reg. 20987) yielded data that were compiled in an interim report containing tentative charges and that were submitted to the railroads for comment. 337 I. C. C. 183. Although the Commission was admittedly uncertain whether its proposed charges would accomplish the statutory objective, *id.*, at 191, and even though "the opportunity to present evidence and arguments" was contemplated, *id.*, at 183, congressional impatience militated against further delay in implementing § 1 (14)(a).[2] Consequently, the Commission rejected the requests of the appellees and other railroads for further hearings and promulgated an in-

---

[2] See Hearing before the Subcommittee on Surface Transportation of the Senate Committee on Commerce, 91st Cong., 1st Sess. (1969).

centive per diem rate schedule for standard boxcars. 337 I. C. C. 217.

Appellees then brought this action in the District Court alleging that they were "prejudiced" within the meaning of the Administrative Procedure Act by the Commission's failure to afford them a proper hearing. 322 F. Supp. 725 (MD Fla. 1971). Seaboard argued that it had been damaged by what it alleged to be the Commission's sudden change in emphasis from specialty to un-equipped boxcars and that it would lose some $1.8 million as the result of the Commission's allegedly hasty and experimental action. Florida East Coast raised significant challenges to the statistical validity of the Commission's data,[3] and also contended that its status as a terminating railroad left it with a surfeit of standard boxcars which should exempt it from the requirement to pay incentive charges.

Appellees, in other words, argue that the inadequacy of the supply of standard boxcars was not sufficiently established by the Commission's procedures. Seaboard contends that specialty freight cars have supplanted standard boxcars and Florida East Coast challenges the accuracy of the Commission's findings.

In its interim report, the Commission indicated that there would be an opportunity to present evidence and arguments. See 337 I. C. C. 183, 187. The appellees could reasonably have expected that the later hearings would give them the opportunity to substantiate and elaborate the criticisms they set forth in their

---

[3] Florida East Coast argues, for example, that the Commission's finding of a boxcar shortage may be attributable to a variety of sampling or definitional errors, asserting that it is unrealistic to define boxcar deficiencies in such a manner as "to show as a 'deficiency' the failure to supply a car on the day requested by the shipper no matter when the request was received." The Government's contention that a 24-hour standard was not used seems unresponsive to this argument. See 337 I. C. C. 217, 221.

initial objections to the interim report. That alone would not necessarily support the claim of "prejudice." But I believe that "prejudice" was shown when it was claimed that the very basis on which the Commission rested its finding was vulnerable because it lacked statistical validity or other reasoned basis. At least in that narrow group of cases, prejudice for lack of a proper hearing has been shown.

Both *Long Island R. Co.* v. *United States,* 318 F. Supp. 490 (EDNY 1970), and the present case involve challenges to the Commission's procedures establishing incentive per diem rates. In *Long Island,* however, the railroad pointed to no specific challenges to the Commission's findings (*id.,* at 499), and the trial was conducted on stipulated issues involving the right to an oral hearing. *Id.,* at 491 n. 2. Since Long Island presented no information which might have caused the Commission to reach a different result,[4] there was no showing of prejudice, and *a fortiori* no right to an oral hearing. In the

---

[4] In the *Long Island* case the court, speaking through Judge Friendly, said:

"Whether there was to be an oral hearing or not, the Long Island's first job was to examine the basic data and find this out. Nothing stood in its way. . . . If, on examining the data, the Long Island had pointed to specifics on which it needed to cross-examine or present live rebuttal testimony and the Commission had declined to grant an oral hearing, we would have a different case. Instead the Long Island's request for an oral hearing was silent as to any respect in which the Commission's disclosure of greater detail or cross-examination of the Commission's staff was needed to enable it to mount a more effective argument against the Commission's proposal. The last sentence of § 556 (d) would be deprived of all meaning if this were held sufficient to put the agency on notice that 'prejudice' would result from the denial of an oral hearing. Even taking into account the further representations that have been made to us, we fail to see that prejudice has been established." 318 F. Supp. 490, 499.

present case, by contrast, there are specific factual disputes and the issue is the narrow one of whether written submission of evidence without oral argument was prejudicial.

The more exacting hearing provisions of the Administrative Procedure Act, 5 U. S. C. §§ 556–557, are only applicable, of course, if the "rules are required by statute to be made on the record after opportunity for an agency hearing." *Id., § 553 (c).*

*United States* v. *Allegheny-Ludlum Steel Corp.,* 406 U. S. 742, was concerned strictly with a rulemaking proceeding of the Commission for the promulgation of "car service rules" that in general required freight cars, after being unloaded, to be returned "in the direction of the lines of the road owning the cars." *Id.,* at 743. We sustained the Commission's power with respect to these two rules on the narrow ground that they were wholly legislative. We held that § 1 (14)(a) of the Interstate Commerce Act, requiring by its terms a "hearing," "does not require that such rules 'be made on the record'" within the meaning of § 553 (c). *Id.,* at 757. We recognized, however, that the precise words "on the record" are not talismanic, but that the crucial question is whether the proceedings under review are "an exercise of legislative rulemaking" or "adjudicatory hearings." *Ibid.* The "hearing" requirement of § 1 (14)(a) cannot be given a fixed and immutable meaning to be applied in each and every case without regard to the nature of the proceedings.

The rules in question here established "incentive" per diem charges to spur the prompt return of existing cars and to make the acquisition of new cars financially attractive to the railroads.[5] Unlike those we considered in

---

[5] Title 49 CFR § 1036.1 provides:

"*Application.*—Each common carrier by railroad subject to the Interstate Commerce Act shall pay to the owning railroads, including

*Allegheny-Ludlum,* these rules involve the creation of a new financial liability. Although quasi-legislative, they are also adjudicatory in the sense that they determine the measure of the financial responsibility of one road for its use of the rolling stock of another road. The Commission's power to promulgate these rules pursuant to § 1 (14)(a) is conditioned on the preliminary *finding* that the supply of freight cars to which the rules apply is inadequate. Moreover, in fixing incentive compensation once this threshold finding has been made, the Commission "shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply . . . ." [6]

---

the owning railroads of Canada, the additional per diem charges set forth in § 1036.2 on all boxcars shown below, . . . while in the possession of nonowning railroads and subject to per diem rules. These charges are in addition to all other per diem charges currently in effect or prescribed. Mexican-owned cars are exempt from the operation of these rules. The rules of this part shall apply regardless of whether the foregoing boxcars are in intrastate, interstate, or foreign commerce."

As I have noted, § 1036.2 contains a schedule of per diem rates or fees for the use of another's boxcars which have been shunted onto its tracks, the rates or fees being definite or precise and controlled by two variables: the cost of the boxcars and the ages of the boxcars. These rates or fees, according to the record, amount to millions of dollars a year.

[6] The Commission discusses the critical factual issues to be resolved in fixing incentive compensation rates under § 1 (14)(a) in *Incentive Per Diem Charges,* 332 I. C. C. 11, 14–15:

"Before an incentive element, either interim or long-term, can be added to the per diem charge for the use of any particular type of freight car, we are required to give consideration to the national level of ownership of that type of car and to other factors affecting the adequacy of the national freight car supply. We have observed that the adequacy of the national freight car fleet depends upon the interplay of a number of factors, none of which can be said to be of superior importance. Further, since the effect of an incentive

The majority finds *ICC* v. *Louisville & Nashville R. Co.*, 227 U. S. 88, "sufficiently different" as to make the opinion in that case inapplicable to the case now before us. I would read the case differently, finding a clear mandate that where, as here, ratemaking must be

---

charge must be produced over a future period, consideration must be given to possible changes in these factors. In recent years many innovations and improvements have taken place in car design and operation. In the transportation of many commodities the standard boxcar has been replaced by cars capable of transporting greater loads with substantially less damage. In the transportation of grains, railroads are converting more and more to the use of large covered hopper cars. Shippers of lumber and plywood have found modern cars designed to facilitate transportation of their products increasingly desirable. At the same time, many of these cars are adaptable to the transportation of other commodities when not needed in the particular trade for which they were designed. In large part, the special service boxcars, covered hoppers and flatcars of various types handle traffic which formerly moved in general service boxcars. The same is true to some extent with respect to refrigerator cars. Their larger size and, with respect to the flatcars in trailer-on-flatcar (TOFC) service, their more rapid turnaround, enables them to provide service which would require many more of the general service boxcars which they replaced.

"Valid conclusions as to the types of cars, the construction of which for future use is to be encouraged by application of either an interim or long-range incentive charge, and which must be found to be in inadequate supply pursuant to the statutory requirement, necessarily require consideration of the extent to which the transportation service they perform is or can also be provided by cars of other types. Such consideration requires a thorough analysis of the services currently desired by the shipping public and those reasonably to be anticipated in the future. An overall, nationwide review of traffic and service demands and trends must precede any valid determination of the existing or prospective national requirements for freight cars of particular types. It is quite obvious that application of an incentive charge which served to encourage the acquisition of cars not adaptable to efficient provision of needed service over their normal lifetime would not be in the national interest. Shipper need, demand and acceptance with respect to future equipment is a significant factor."

.

based on evidential facts, § 1 (14)(a) requires that full hearing which due process normally entails. There we considered Commission procedures for setting aside as unreasonable, after a hearing, carrier-made rates. The Government maintained that the Commission, invested with legislative ratemaking power, but required by the Commerce Act to obtain necessary information, could act on such information as the Congress might. The Government urged that we presume that the Commission's findings were supported by such information, "even though not formally proved at the hearing." *Id.*, at 93. We rejected the contention, holding that the right to a hearing included "an opportunity to test, explain, or refute. . . . All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal." *Ibid.* I would agree with the District Court in *Long Island R. Co., supra,* at 497, that Congress was fully cognizant of our decision in *Louisville & Nashville R. Co.* when it first adopted the hearing requirement of § 1 (14)(a) in 1917. And when Congress debated the 1966 amendment that empowered the Commission to adopt incentive per diem rates, it had not lost sight of the importance of hearings. Questioned about the effect that incentive compensation might have on terminating lines, Mr. Staggers, Chairman of the House Committee on Interstate and Foreign Commerce and floor manager of the bill, responded: "I might say to the gentleman that this will not be put into practice until there have been *full hearings* before the Commission and all sides have had an opportunity to argue and present their facts on the question." 112 Cong. Rec. 10443 (emphasis added). Nor should we overlook the Commission's own interpretation of the hearing requirement in § 1 (14)(a) as it applies to this case. The Commission's order initiat-

ing the rulemaking proceeding notified the parties that it was acting "under authority of Part I of the Interstate Commerce Act (49 U. S. C. § 1, et seq.); more particularly, section 1 (14)(a) and the Administrative Procedure Act (5 U. S. C. §§ 553, 556, and 557)." Clearly, the Commission believed that it was required to hold a hearing on the record.[7] This interpretation, not of the Administrative Procedure Act, but of § 1 (14)(a) of the Commission's own Act, is "entitled to great weight." *United States* v. *American Trucking Assns.*, 310 U. S. 534, 549; *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 315.

The majority, at one point, distinguishes *Morgan* v. *United States*, 304 U. S. 1 (*Morgan II*), on the ground that the proceedings there involved were "quasi-judicial," "and thus presumably distinct from a rulemaking proceeding such as that engaged in by the Commission here." It is this easy categorization and pigeonholing that leads the majority to find *Allegheny-Ludlum* of controlling significance in this case. *Morgan II* dealt with the "full hearing" requirement of § 310 of the Packers and Stockyards Act, 42 Stat. 166, as it related to ratemaking for the purchase and sale of livestock.[8] It is true that the Court characterized the proceedings as "quasi-

---

[7] In its final report, the Commission apparently still believed that its proceedings had to comply with the provisions of § 556 of the Administrative Procedure Act. The report stated that the parties had been granted a hearing in accordance with those provisions. 337 I. C. C., at 219.

[8] *Morgan II* considered in some depth the parameters of a "full hearing." The majority takes the position that the case is inapposite because the hearings provided in this case do not "suffer from the defect found to be fatal in *Morgan*"—*i. e.*, the parties were "fairly advised" of the scope and substance of the Commission proceedings. In *Morgan II*, however, there was no question that a "full hearing" included the right to present oral testimony and argument. 304 U. S. 1, 18–20.

judicial." But, the first time the case was before the Court, *Morgan* v. *United States*, 298 U. S. 468, Mr. Chief Justice Hughes noted that the "distinctive character" of the proceeding was legislative: "It is a proceeding looking to legislative action in the fixing of rates of market agencies." *Id.*, at 479. Nevertheless, the Secretary of Agriculture was required to establish rates in accordance with the standards and under the limitations prescribed by Congress. The Court concluded: "A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. Hence it is frequently described as a proceeding of *quasi-judicial* character. The requirement of a 'full hearing' has obvious reference to the tradition of judicial proceedings . . . ." *Id.*, at 480.

Section 1 (14)(a) of the Interstate Commerce Act bestows upon the Commission broad discretionary power to determine incentive rates. These rates may have devastating effects on a particular line. According to the brief of one of the appellees, the amount of incentive compensation paid by debtor lines amounts to millions of dollars each six-month period. Nevertheless, the courts must defer to the Commission as long as its findings are supported by substantial evidence and it has not abused its discretion. "All the more insistent is the need, when power has been bestowed so freely, that the 'inexorable safeguard' . . . of a fair and open hearing be maintained in its integrity." *Ohio Bell Telephone Co.* v. *Public Utilities Comm'n,* 301 U. S. 292, 304.

Accordingly, I would hold that appellees were not afforded the hearing guaranteed by § 1 (14)(a) of the Interstate Commerce Act and 5 U. S. C. §§ 553, 556, and 557, and would affirm the decision of the District Court.