OPINION OF THE COURT
Martin B. Stecher, J.
In this action for declaratory and other relief, the plaintiffs move for an order pendente lite "enjoining the operation and effectiveness” of Rent Guidelines Order No. 10, adopted June 27, 1978 by the Rent Guidelines Board of the City of New York (which, with its members, is hereafter designated the "defendants”) and directing that during the pendency of this action the owners of rent stabilized apartments in the City of New York be permitted to enter into renewal and vacancy leases with their tenants at the rates of increase which were in effect during the preceding calendar year. The plaintiffs suggest that such relief be conditioned on an appropriate escrow of the increased amount of rentals during the pendency of the action.
The complaint which seeks class relief, asserts five causes of action. The first four are for declaratory relief (CPLR 3001 and 904, subd [a]) on the grounds that the guidelines were not adopted by a majority of the board as "majority” is defined by statute (General Construction Law, § 41); the denial of "due process of law” by defendants’ failure to provide the plaintiffs and their alleged class a hearing; on the grounds that the defendants failed to afford the plaintiffs a hearing in purported violation of the Rent Stabilization Law (Administrative Code of City of New York, § YY51-5.0, subd b); and because the defendants allegedly violated the State "Open Meetings Law” (Public Officers Law, art 7). Additionally, there is a Federal Civil Rights Law (US Code, tit 42, § 1983) cause of action for damages with which we are not concerned on this motion.
The Rent Stabilization Law (Administrative Code, § YY51 *315 5.0, subd b) provides in part: "The rent guidelines board shall establish annually guidelines for rent adjustments, and in determining whether rents for housing accommodations subject to the emergency tenant protection act of nineteen seventy-four or this law shall be adjusted shall consider, among other things (1) the economic condition of the residential real estate industry in the affected area including such factors as the prevailing and projected (i) real estate taxes and sewer and water rates, (ii) gross operating maintenance costs (including insurance rates, cost of fuel and labor costs), (iii) costs and availability of financing (including effective rates of interest), (iv) over-all supply of housing accommodations and over-all vacancy rates, (2) relevant data from the current and projected cost of living indices for the affected area, (3) such other data as may be made available to it. Not later than July first of each year, the rent guidelines board shall file with the city clerk its findings for the preceding calendar year, and shall accompany such findings with a statement of the maximum rate or rates of rent adjustment, if any, for one or more classes of accommodations subject to this law, authorized for leases or other rental agreements commencing during the next succeeding twelve months. Such findings and statement shall be published in the city record.”
The board is, by code provision (§ YY51-5.0, subd a), to consist of nine members. On June 27, 1978, when the board first met publicly and "adopted” Rent Guidelines Order No. 10, a vacancy existed. The eight members met and voted on the proposed guideline. Four members supported it, three members opposed it and the chairman abstained.
Section 41 of the General Construction Law provides: "Quorum and majority. Whenever three or more public officers are given any power or authority, or three or more persons are charged with any public duty to be performed or exercised by them jointly or as a board or similar body, a majority of the whole number of such persons or officers, at a meeting duly held at a time fixed by law, or by any by-law duly adopted by such board or body, or at any duly adjourned meeting of such meeting, or at any meeting duly held upon reasonable notice to all of them, shall constitute a quorum and not less than a majority of the whole number may perform and exercise such power, authority or duty. For the purpose of this provision the words 'whole number’ shall be construed to mean the total number which the board, commission, body or other group of *316 persons or officers would have were there no vacancies and were none of the persons or officers disqualified from acting.”
There can be no doubt that the defendants, collectively, are a "board” within the meaning of the statute; and that an affirmative vote of five of its members was and is necessary for them to "exercise [any] power, authority or duty” (cf. Matter of Squicciarini v Planning Bd. of Town of Chester, 38 NY2d 958). The vote on the guideline taken June 27, 1978, supported as it was by but four members, was clearly a nullity.
Upon receipt of the petitioner’s challenge (the show cause order dated July 21, 1978) the defendants sought to repair the damage. A meeting was held on August 10, 1978, at which time the defendants resolved, by a five-to-three vote, that the chairman who abstained on the original vote, be permitted "to cast her vote * * * nunc pro tunc as of June 27, 1978 and she having voted thereafter in favor of the provision nunc pro tunc as of June 27, 1978,” the guideline was deemed adopted.
Again the plaintiffs challenged the vote in that no reconsideration was had by the entire board, a single person having cast a single vote. To relieve their continuing uncertainty, the board reconvened on August 30, 1978, the day following the argument of this motion. Six members attended and Guideline No. 10 was adopted by a five-to-one vote.
Although the Administrative Code (§ YY51-5.0, subd b) mandates that "the maximum rate or rates of rent adjustment” be filed with the city clerk not later than July 1 each year, where, as here, no such rate was previously adopted, the board was not foreclosed from setting a rate after July 1 assuming, of course, that its acts were otherwise in order.
The plaintiffs’ challenge to Rent Guideline No. 10 on due process grounds cannot be sustained. As the defendants and interveners contend, the defendants are engaged in legislative as distinguished from adjudicative function, a distinction which remains very much alive (Alaska Airlines v Civil Aeronautics Bd., 545 F2d 194). The difference between them is suggested in Davis, Administrative Law (vol 1, § 7.02, p 413, cited with approval in Alaska Airlines, supra); "Adjudicative facts are the facts about the parties and their activities, businesses, and properties. Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general *317 facts which help the tribunal decide questions of law and policy discretion.” (To the same effect see United States v Florida East Coast Ry. Co., 410 US 224.)
As was stated in Alaska Airlines (supra, p 200), "Where adjudicative, rather than legislative, facts are involved, the parties must be afforded a hearing to allow them an opportunity to meet and to present evidence. The determinative inquiry is whether the agency is engaged in rule-making, a legislative function which requires no hearing, or in adjudication, a judicial function which may require a hearing to resolve disputed facts.”
In the Matter of Kew Gardens Sanitarium v Whalen (55 AD2d 226, 228, affd 43 NY2d 675), the court said: "It is well established that the Legislature may delegate to administrative agencies the discretionary power to formulate rules and regulations to effectuate the provisions and purposes of a statute (Matter of City of Utica v Water Pollution Control Bd., 5 NY2d 164). Since the initial function of establishing rates is a legislative one, a hearing is not a prerequisite unless the Legislature so directs (Wasservogel v Meyorowitz, 300 NY 125). None was directed in the instant legislation and, consequently, none is required by it. Petitioners argue, however, that to impose a reduced rate for health services prior to a hearing amounts to a denial of due process. We disagree.”
In Matter of Lakeland Water Dist. v Onondaga County Water Auth. (24 NY2d 400, 407), it was said that "[a]n article 78 proceeding, it is settled, may not be utilized to review legislative action [citing cases], and an order of an administrative agency fixing rates is deemed a legislative act, at least where no provision has been made for notice and a hearing.”
The distinction between legislative and adjudicative proceedings is necessary as a practical matter. In an adjudicative proceeding, there are few parties and hearing their testimony is no impediment to an ultimate determination. Where the function is legislative tens of thousands of people may be involved as they are in this case. No landlord — or tenant for that matter — is less aggrieved by a rent guideline than another and were the defendants to hear them all no conclusion would ever be reached.
The plaintiffs, cognizant of this problem, have apparently sought to deal with it in their reply memorandum by stating that at the very least they desire an opportunity to make a written submission, to make factual data available and to *318 have a representative make an oral presentation. While this is certainly a most reasonable request, it is not for the court but for the Rent Guidelines Board as indicated, infra, to regulate the manner in which it shall receive the data contemplated by the Rent Stabilization Law (Administrative Code, § YY51-5.0, subd b, par [3]).
The defendants’ abortive adoption of Rent Guideline No. 10 was in clear violation of the State "Open Meetings Law” (Public Officers Law, art 7).[1] The defendants constitute a "public body” within the meaning of that statute (§ 97, subd 2) and any "formal convening” of the defendants for the purpose of "officially transacting public business” (§ 97, subd 1) must, with certain exceptions not pertinent here (§ 100) be on "[p]ublic notice of the time and place * * * given, to the extent practicable, to the public and news media at a reasonable time prior thereto” (§ 99, subd 2) and above all must "be open to the general public” (§ 98, subd [a]).
It is undisputed that the defendants met at least four times prior to July 1, 1978, and a quorum (General Construction Law, § 41) of the board’s members attended each such meeting. The first three meetings were neither announced to the press nor open to the public. In the language of the chairman of the defendant board:
"On three occasions (June 13, 16, and 21), an employee of the Department of Housing Preservation and Development, who was assigned to serve as staff analyst of the Rent Guidelines Board, presented the data contained in the Bureau of Labor Statistics report to me and to those members of the Board then present. On none of these occasions were there deliberations among the Board members nor was there any vote taken.
"Thereafter, on June 21, 1978, I called an open meeting of the Board for June 27, 1978.”
These meetings differed in no material way from the "work sessions” of Newburgh’s City Council described in Matter of Orange County Pub., Div. of Ottaway Newspapers v Council of City of Newburgh (60 AD2d 409). There, as here, the council assumed the position "that meetings were required to be open to the public only in the event a formal vote on government *319 business was to be taken” (p 412). This contention was rejected in the Newburgh case (supra, pp 415, 416, 418):
"We believe that the Legislature intended to include more than the mere formal act of voting or the formal execution of an official document. Every step of the decision-making process, including the decision itself, is a necessary preliminary to formal action. Formal acts have always been matters of public record and the public has always been made aware of how its officials have voted on an issue. There would be no need for this law if this was all the Legislature intended. Obviously, every thought, as well as every affirmative act of a public official as it relates to and is within the scope of one’s official duties is a matter of public concern. It is the entire decision-making process that the Legislature intended to affect by the enactment of this statute. * * *
"We agree that not every assembling of the members of a public body was intended to be included within the definition. Clearly casual encounters by members do not fall within the open meetings statutes. But an informal 'conference’ or 'agenda session’ does, for it permits 'the crystallization of secret decisions to a point just short of ceremonial acceptance’ * * *
"It is clear that there is a pervasive tendency for our public officials to attempt to function in secrecy [see, e.g., Del Code Ann, tit 29, §§ 10001-10005 (Supp 1976); Mich Compiled Laws Ann, §§ 15.261 to 15.273 (Supp 1977); NJ Stat Ann, §§ 10:4-7, 10:4-8, 10:4-12, 10:4-15; and SC Code Ann, tit 30, §§ 3-10 to 3-40, subds (a), (b) (Supp 1977); Access to Official Information: A Neglected Constitutional Right, 27 Ind LJ 209]. The Federal Government has adopted the Freedom of Information Act (US Code, tit 5, § 552, as amd by PL 93-502, §§ 1-3 [Nov. 21, 1974]), which purports to prevent such secrecy by granting access to government records. On the State level, 'sunshine’ laws have been enacted to expose and lay bare the decision-making process of governmental bodies.”
The convenings of the board for the consideration of the very data which was to result in the final vote was required to be public, so that the public, landlords and tenants alike, could not only know its fate, but how it was to be arrived at. Such secrecy violated the statute.
The defendants seek to avert the consequence of violating the Open Meetings Law by asserting, in the words of the board’s chairman, that they "acted in good faith and did not *320 intend to violate the Open Meetings Law, and [because] no meaningful purpose could be served by now calling public meetings in order to repeat these 'briefing sessions’.” The enforcement provisions of the statute (§ 102) permit the court "upon good cause shown, to declare any action or part thereof taken in violation of this article void in whole or in part” although "[a]n unintentional failure to fully comply [sic] with the notice provisions * * * shall not alone be grounds for invalidating any action taken at a meeting of a public body” (emphasis supplied). It is dubious that any notice was given to the news media (§ 99), the evidence of such notice being hearsay, scant and remote. However, the determination of the issue in no way rests on that violation of the statute.
In determining the effect of the failure to open meetings to the public it is necessary to examine the nature of the public body’s work and the statutory authority under which it functions. It is in this context that we also examine the plaintiffs’ last contention, that the defendants were obligated by the Rent Stabilization Law (Administrative Code, § YY51-5.0, subd b, par [3]) to afford the plaintiffs a hearing. This section of the code, set forth in full above, mandates the data which the board shall consider in arriving at its guidelines; and among them is "such other data as may be made available to it.” Contrary to the urging of the plaintiffs, I do not find that this language mandates public hearings, as that expression is ordinarily understood. Read together with the Open Meetings Law, however, it becomes apparent that as interested persons become aware during the course of public meetings, of the data and considerations upon which the defendants intend to base a judgment, that they shall have an opportunity to present, in some fashion and at some time, reasonably determined by the board, supporting or contradicting data. It is the opportunity to give meaning to the code language requiring the board to "consider * * * (3) such other data as may be made available to it.”
The obligation to consider other data carries with it a corresponding duty to provide an opportunity to present such data. It is no answer for the defendants to say that in past years tenant and landlord groups each provided them with unsolicited data. A public body which by law is obligated to consider such data has an obligation to provide the means for its presentation and an opportunity for interested persons to determine whether or not it has been considered. For better or *321 worse, the Legislature has decreed that the day of administrative secrecy is at an end in this State.
The defendants’ failure to abide by the statutory (Open Meetings Law) and code (Rent Stabilization Law) provisions had the effect of excluding the public oversight and the public participation which the Legislature and city council, respectively, intended. An injunction restraining the implementation of Rent Guideline Order No. 10 pending trial of the action and remand to the defendants for further proceedings consistent with this opinion is the necessary consequence. It is at this juncture that I must take note of the defendant board chairman’s suggestion that a remand for public hearings could serve "no meaningful purpose”, that its effect would be merely to "repeat these 'briefing sessions’.” It should now be clear that such is not the sole purpose of the remand.
In view of the determination made here that a remand is necessary for procedural violations, I do not address the charges of the plaintiffs that the defendants have failed to consider economic data some of which is mandated by the Rent Stabilization Law (Administrative Code, § YY51-5.0, subd b) such as the experience of pre-1947 buildings which allegedly contain the "vast majority” of rent stabilized apartments; "the economic conditions of the residential real estate industry”; the improper reliance on Bureau of Labor Statistics price data as distinguished from landlords’ cost data (cost — price X number of units); and the increased costs of financing, among others.
The plaintiffs are, of course, less concerned with the procedural questions here disposed of then they are with the economic issue, the maximum rents which they may charge during the ensuing three years. That decision, ultimately, is for the defendants; but the issue presented here is the interim relief to be afforded during the pendency of this action and the issuance of a new rent guideline order. What the plaintiffs seek is an interim continuation of the rates of increase allowed under the recently expired Rent Guideline No. 9, with "the differential percentage amount” of the rents being placed in interest-bearing escrow accounts similar to tenant security deposit accounts (General Obligations Law, § 7-103).
Rent Guideline Order No. 9 allowed a QVz% increase over the previous rental for a rent stabilized apartment for a one-year lease; 8V2% for a two-year lease; and ÍÍVz% for a three-year lease. Rent Guideline Order No. 10 allows increses of *322 SV2%, 5ló% and 710.% for one-, two- and three-year leases, respectively, where prior leases expire or apartments become vacant during the 12 months beginning July 1, 1978.
In order to be entitled to a mandatory injunction fixing an interim rental increase formula, the plaintiffs must show a clear legal right to such relief (cf. Park Terrace Caterers v McDonough, 9 AD2d 113) and, among other things, a likelihood of ultimate success on the merits (cf. Albina v Solork Assoc., 37 AD2d 835) in acquiring an increase.
I have examined closely the economic data offered and I cannot say that the plaintiffs have met these obligations. The plaintiffs allege a "raging inflation”, of which I take judicial notice, and various data emanating from official Washington sources. Among them is the opinion that the cost of living index will rise by 7XA% during the next year and that the 1978 second quarter rate of increase in that same index rose at an annual rate of nearly 12%. Items in the cost of living index differ both in identity and in weight from the items which constitute cost of maintenance and operation of residential real property. Thus food, clothing, transportation and shelter itself are significant items in the cost of living index which do not affect at all maintenance and operation costs. Taxes, power and fuel are to be found in both sets of statistics, but their relative weight is grossly dissimilar. To presume that because prediction of increased shelter costs is made in Washington that we must allow them as interim relief in New York is to engage in prophecy fulfillment.
The plaintiffs also point to stabilization increases, under a similar statute, granted in the neighboring Counties of Nassau, Rockland and Westchester. These rates, contrasted to Rent Guideline Orders No. 9 and No. 10, are as follows:
Lease N.Y.C. Order Term No. 9 No. 10 Nassau Rockland Westchester[2] 1 year 6/2% 3/2% 6% 5% 6% 2 years 8/2% 5/2% 8% 8% 7.4% 3 years 11/2% 7/2% 10% 11% 9.97%
*323 While these comparisons, in view of the more open procedures followed in the neighboring counties, must raise many questions about Guideline No. 10, the data bases are necessarily dissimilar. While fuel prices do not differ materially, power, tax and labor costs frequently do.
As indicated above, it has not been demonstrated that a new Rent Guideline Order No. 10 will result in a substantial rate of increase.
Plaintiffs urge, nonetheless, that the interim increase be ordered by the court and the sums placed in escrow. I can only observe that in the cases cited in which such escrows were ordered the rates subject to escrow had already been fixed, statutorily or administratively (e.g., Mayer v City Rent Agency, 45 NY2d 822). For me to fix an interim rate would be to engage in the sheerest speculation. Adopting the rates of Guideline No. 9 would not result in maintaining the status quo. It would be imposing an interim rate based on insufficient data.
It is necessary, however, that tenants and landlords be enabled to enter new leases as old ones expire or as rent stabilized apartments become vacant. Imperfect as Rent Guideline Order No. 10 may be because of faulty or inadequate data, it is supported by some economic data; and accordingly during the pendency of this action, the promulgation of a new guideline order or the further order of the court, landlords and tenants of rent stabilized apartments may enter leases for one, two or three years, in accordance with law, at rates of increase over rentals prevailing on expiration of current leases at the rates promulgated under Rent Guideline Order No. 10. Such leases may, of course, as is customary in the industry provide for an increase or decrease retroactive to the inception of the lease should different rates ultimately be adopted.
The order to be settled shall affect only the subject matter of this litigation and shall provide a schedule of proceedings which shall result in an early rent guideline order retroactive to July 1, 1978. I assume, of course, that the defendants will act diligently so as to forestall deeper involvement of the court.

. Statutory references hereafter, unless otherwise noted, are to the Public Officers Law.

. The Westchester figures for two- and three-year leases are averages of what would be paid over the term of the lease. Thus, a two-year lease allows a 5% increase the first year and a 4% increase the second. A three-year lease allows increases of 5%, 5% and 4%, respectively, during each year. A collateral benefit — to landlords — is that the three-year rental is up 14%, a higher springboard for the next increases.