619 F.2d 314
 SPARTAN RADIOCASTING COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION, and United States of
America, Respondents,
Key Television, Inc., Great Lakes Communications, Inc.,
Wyneco Communications, Inc., D. H. Overmyer Telecasting
Company, National Cable Television Association, Inc.,
Post-Newsweek Stations, Connecticut, Inc., Post-Newsweek
Stations, Florida, Inc., Intervenors.
SPARTAN RADIOCASTING COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION, and United States of
America, Respondents,
Post-Newsweek Stations, Florida, Inc.; Post-Newsweek
Stations, Connecticut, Inc.; Great Lakes Communications,
Inc.; Springfield Television Corporation; D. H. Overmyer
Telecasting Company; Key Television, Inc.; Wyneco
Communications, Inc.; Summit Radio Corporation; Forward of
Illinois, Inc.; Plains Television Corporation; Roy H. Park
Broadcasting of Utica-Rome, Inc.; Studio Broadcasting System
Division of Highwood Service, Inc.; Winnebago Television
Corp.; Pullman TV Cable Co., Inc.; National Association of
Broadcasters; Bibb Television, Inc.; RJN Broadcasting, Inc.;
Broadcasting-Telecasting Services, Inc.; WBRE-TV, Inc.;
Pennsylvania Cable Television Association; Virginia
Broadcasting Corporation; The Klix Corporation;
Scripps-Howard Broadcasting Company; Desert Empire
Television Corporation; Knight-Ridder Broadcasting, Inc.;
Capital Cities Communications, Inc.; Scranton Broadcasters,
Inc.; New England Cable Television Association; Aberdeen
Tele-Cable, Inc.; Allen's TV Cable Service, Inc.; American
Video Corp.; Apple Valley TV Cable, Inc.; Asbury and James
TV Cable Service; Audubon Electronics, Inc.; B & D Electric,
Inc.; Better Cable TV; Big Canoe Corporation; Bishop Cable
TV, Inc.; Breckenridge TV Distributing Co.; Brownwood TV
Cable Service, Inc.; Cable Antenna Systems; Cablevision of
Pennsylvania, Inc.; Carthage Cablevision, Inc.; Cass
Community Antenna; CATV General Corporation; Central
Communications, Inc.; Central Plains Cable TV; Century
Communications Corp.; Chattanooga Cable TV Co.; Clear Cable
Co., Inc.; Colby Cable Corporation; Communications Systems,
Inc., Intervenors.
HENSON AVIATION, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION, and United States of
America, Respondents,
Ponderosa Television, Inc.; Raystay Co. d/b/a TV Cable of
Waynesboro; Winchester TV Cable Co., Inc., Intervenors.
 Nos. 78-1240, 78-1566 and 78-1757.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 5, 1979.
Decided April 11, 1980.
 
 Michael S. Horne, Washington, D. C. (Donna M. Murasky, J. Geoffrey Bentley, Covington & Burling, Washington, D. C., on brief), for Spartan Radiocasting Company (WSPA-TV), Post-Newsweek Stations, Connecticut, Inc. (WFSB-TV), Post-Newsweek Stations, Florida, Inc. (WPLG), Broadcasting-Telecasting Services, Inc. (WBBH-TV), Scranton Broadcasters, Inc. (WDAU-TV), and WBRE-TV, Inc. (WBRE-TV).
 Richard Hildreth, Washington, D. C. (Vincent J. Curtis, Jr., Robert L. Pettit, Fletcher, Heald & Hildreth, Washington, D. C., on brief), for Henson Aviation, Inc. (WHAG-TV).
 Erwin G. Krasnow, Washington, D. C., on brief for National Association of Broadcasters.
 Joel Rosenbloom, Wilmer, Cutler & Pickering, Washington, D. C., on brief, for Knight-Ridder Broadcasting, Inc. (WJRT-TV, WPRI-TV, WTEN(TV), WCDC(TV)), and Capital Cities Communications, Inc. (KFSN-TV, KTRK-TV, WKBW-TV, WPVI-TV, WTNH-TV and WTVD).
 Steven A. Lerman, McKenna, Wilkinson & Kittner, Washington, D. C., on brief, for Summit Radio Corp. (WAKR-TV), Forward of Illinois (WRAU-TV), Plains Television Corporation (WICS), Roy H. Park Broadcasting of Utica (WUTR), Studio Broadcasting System Division, Highwood Service, Inc. (KTSB-TV), and Winnebago Television Corp. (WTVO).
 Peter Shuebruk, Fly, Shuebruk, Blume, Gaguine, Boros & Schulkind, New York City, on brief, for D. H. Overmyer Telecasting Co. (WDHO-TV), Wyneco Communications, Inc. (KYCU-TV).
 Martin E. Firestone, Stein, Halpert & Miller, Washington, D. C., on brief, for Springfield Television Corporation (WKEF).
 William M. Barnard, Kenkel & Barnard, Washington, D. C., on brief, for Bibb Television, Inc. (WCWB-TV).
 Arthur B. Goodkind, Koteen & Burt, Washington, D. C., on brief, for Amaturo Group, Inc. (KQTV), KCST, Inc. (KCST-TV), McGraw-Hill Broadcasting, Inc. (KERO-TV), NEP Communications, Inc. (WNEP-TV), and Desert Empire Television Corporation (KMIR-TV).
 James E. Greeley, Washington, D. C., on brief, for RJN Broadcasting, Inc. (WLFI-TV).
 Reed Miller, Arnold & Porter, Washington, D. C., on brief, for Virginia Broadcasting Corporation (WVIR-TV).
 William J. Potts, Jr., Haley, Bader & Potts, Washington, D. C., on brief, for Klix Corporation (KMVT).
 Howard M. Weiss, Mullin, Connor & Rhyne, P. C., Washington, D. C., on brief, for Ponderosa Television, Inc. (KTVZ).
 Keith H. Fagan, F. C. C. (John H. Shenefield, Asst. Atty. Gen., Robert B. Nicholson and Daniel J. Conway, Dept. of Justice, Robert R. Bruce, Gen. Counsel, David J. Saylor, Deputy Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Washington, D. C., on brief), for Federal Communications Commission and United States of America.
 Paul R. Schwedler, Michael B. Isaacs, Washington, D. C., for National Cable Television Association.
 Sol Schildhause, Farrow, Schildhause, Dent & Wilson, Washington, D. C., for Moscow TV Cable Co., Inc. and Pullman Cable TV Co., Inc.
 Harry J. Ockershausen, Christopher D. Coursen, Dempsey & Koplovitz, Washington, D. C., for Scripps-Howard Broadcasting Company.
 Frederick W. Ford, Lovett, Ford & Hennessey, Washington, D. C., for Winchester Cable TV.
 John P. Cole, Jr., Joseph R. Reifer, Cole, Zylstra & Raywid, Washington, D. C., for Aberdeen Telecable, et al.
 Lewis I. Cohen, Roy W. Boyce, Cohen & Berfield, Washington, D. C., for Pennsylvania Cable Television Association and Raystay Company.
 Paul R. Cianelli, Tilton, N. H., for New England Cable Television Association.
 Before HALL, PHILLIPS and SPROUSE, Circuit Judges.
 K. K. HALL, Circuit Judge:
 
 
 1
 Spartan Broadcasting Company, a television station broadcaster, petitions to have set aside an order of the Federal Communications Commission allowing television cable companies to show duplicating network programming of competing station affiliates in any cable community where there signals are available over-the-air via traditional antenna reception.[1] Previously, the Commission had banned such network competition on cable systems in areas surrounding each affiliate as a means of directing network revenues for local viewing to the nearby affiliate. It had been reasoned that a station's home area should be protected because many stations, especially those in small markets, depended on network revenues to support their local service programming, or even to remain in business. By the order objected to by petitioner, the station affiliate seeking the cable blackout must demonstrate, in a variance proceeding, its need for it.
 
 
 2
 Petitioner contends this "about-face" order abolishing its right to demand blackout of its local competition is arbitrary as against established regulatory policy, its adoption was capriciously undertaken, and the notice requirements of the Administrative Procedure Act were violated. 5 U.S.C. § 551 et seq. We disagree and, accordingly, deny the petition to set the Commission's order aside.
 
 I. BLACKOUT RULES
 
 3
 A recurring problem in cable regulation has been the treatment of stations whose primary service areas are away from a cable community but whose signals are nevertheless available over-the-air to viewers not subscribing to cable reception.
 
 
 4
 The Commission's rules requiring certain stations to be carried in a cable community provide that all "significantly viewed" local signals must be carried when those stations request it. See 47 C.F.R. §§ 76.57, 76.59, 76.61, and 76.63. "Significantly viewed"[2] signals are defined as those which capture a minimum of 3% of total viewing time spread over 25% of all non-cable households. 47 C.F.R. § 76.54.
 
 
 5
 On the other hand, the Commission's general blackout rules, which are designed to protect nearby network affiliates from unfair distant affiliate competition resulting from equalized reception by cable carriage, require that the programs of those distant affiliates be switched off during network time some 60% of total broadcast time.
 
 
 6
 Where a "distant" affiliate was "significantly viewed" in another affiliate's surrounding area without cable, cable companies had to comply with both sets of regulations by carrying the "distant" signals, which in turn had to be blacked out during network time.
 
 
 7
 Switching equipment and additional personnel were required. Depending on the sophistication of the switching equipment, the dial number for the deleted signal would either go blank requiring the viewer to change it or the equipment would impose the nearby station's signal at the blank dial number.
 
 
 8
 Cable subscribers could watch the same network programs as their non-cable neighbors, but they were prevented from seeing the commercials and local spot announcements shown by distant affiliates during those programs.
 
 
 9
 II. COMPREHENSIVE REVIEW OF BLACKOUT RULES COMMENCES
 
 
 10
 In 1974, the Commission initiated its first comprehensive review of its blackout rules since they were promulgated in 1965. See the First Report and Order in Dockets 14895 and 15233, 38 F.C.C.2d 683 (1965). The Commission published a Notice of Inquiry and Proposed Rule Making, Docket 19995, 46 F.C.C.2d 1164 (April 3, 1974) requesting comment on a number of problems including the inconsistency of requiring locally available signals to be carried-and-then-deleted during network time. The notice states one of the Commission's inquiries to be,
 
 
 11
 Can the network program exclusivity (blackout) rules be modified so as to better reflect actual viewing patterns of television signals available off-the-air in cable communities and, thereby, be made more consistent with the Commission's (mandatory) signal carriage rules?
 
 
 12
 Id. Comments on the various issues posed in the notice were numerous.
 
 
 13
 In 1975, in its first report in Docket 19995, the Commission acknowledged the problems created by the blackout rules as a whole.
 
 
 14
 (These) rules have been a constant source of aggravation and irritation. Cable operators contend that the present rules are unduly rigid, that they often require the protection of stations which cannot be viewed against those that can. The notifications received from broadcasters (about which programs are to be shown at certain times) are said to be untimely and erroneous. Additionally, the problems associated with switching equipment seem to create illwill on the part of their subscribers. Subscribers are often furious at both the cable operator from whom they have been led to believe that full-time signal carriage will be provided and the local broadcaster who requests protection. Other sources of irritation occur when they watch a channel carrying a nonprotected station, only to have the next program blacked out, or because of switching errors, a program may be clipped before completion. It is not at all uncommon for local governments, which franchise cable television operations, to find themselves embroiled in such controversies. Moreover, since the Commission established a Cable Complaint Service in the Cable Television Bureau, the volume of complaints registered with regard to the network exclusivity (blackout) rules has far surpassed other categories of subscriber dissatisfaction. In general, broadcasters have complained about the burdens they bear in notifying cable systems of the programs they want to have protected, the attitude with which some cable operators treat these notifications, and the cumbersome machinery of legal enforcement of these rules by the Commission.
 
 
 15
 First Report and Order, Docket 19995, 52 F.C.C.2d 519, 522-23 (1975). This report closes without resolving a number of issues, holding that further proceedings were necessary and jurisdiction was retained in Docket 19995.
 
 III. 1975 SPECIALIZED PROCEEDINGS
 
 16
 Four months later, the Commission published its Further Notice of Proposed Rule Making Docket 19995, 40 Fed.Reg. 34375 (adopted July 30, 1975; released Aug. 8, 1975).[3] Quoting from the first report, this second notice states:
 
 
 17
 "We are not persuaded that an exception to our new exclusivity priorities (blackout rules) should be made for significantly viewed signals (which are arguably available off the cable). . . . (T)he designation of a signal as being significantly viewed is by itself, inadequate to exempt it from our (blackout) rules.
 
 
 18
 "We recognize, however, that there may be situations in which the network programming of such signals should not be deleted."
 
 
 19
 And, it states that, for this problem,
 
 
 20
 The purpose of this Further Notice of Proposed Rule Making is to set a standard which will prevent those television signals, commonly viewed in non-cable households of a cable community, from being blacked out because of the (zones of blackout protection surrounding each station affiliate).
 
 
 21
 Id., App. 60-61. The order in this proceeding came in 1976 in response to comments from 66 broadcast stations and numerous cable companies.
 
 
 22
 IV. 1976 ORDER REFUSING AMENDMENT OF BLACKOUT RULES
 
 
 23
 As the conclusion of the rulemaking in Docket 19995, the Commission issued the Third Report and Order in Docket 19995, 62 F.C.C.2d 99 (Nov. 17, 1976). It explains the problem of deleting locally available programming,[4] and discusses the positions of the interested parties. It concludes,
 
 
 24
 After examining the comments submitted and the policy questions involved in this proceeding, we have been persuaded that the existing rules should be retained. . . . While there are some situations present under the existing rules that appear to be anomalous such as a station not available over-the-air receiving protection, or a financially strong station receiving protection against a weaker station, we have not been able to develop a rule applicable on a nationwide basis that cures these anomalies and at the same time sufficiently guards against the adverse consequences to broadcast service to the public in the remaining situations. The situations which led us to adopt the Further Notice are so diverse that they simply cannot be treated by a single across-the-board standard. All of the many alternatives considered left problems unresolved and at the same time created more difficulties of their own. For these reasons we are not adopting any changes in the rules at this time.
 
 
 25
 Id. at 102. Then the Report emphasizes that where the blackout rules create an "inappropriate result," special relief can be obtained to allow cable carriage of those signals which should not be deleted.[5] The burden of seeking special relief is put on cable companies, distant affiliates, and any other parties objecting to the Commission's protection of the nearby network affiliates. Of course, the proceeding did not terminate with this order.
 
 
 26
 V. 1978 AMENDMENT OF BLACKOUT RULES UPON RECONSIDERATION OF 1976 ORDER
 
 
 27
 A Petition for Reconsideration of this last report in Docket 19995 was timely filed by two cable companies participating in the proceeding. Notice of this petition was published in a table in the Federal Register, 42 Fed.Reg. 1521 (Friday, January 7, 1977).[6]
 
 
 28
 This petition for reconsideration notes, in passing, that the burden of seeking special relief from blackout of locally competing signals should be on the protected broadcast stations rather than on cable companies. It enumerates general problems created by the blackout rules and requests that the final order as a whole be reconsidered. Alternately, it argues in favor of a special rule for a problem peculiar to the western United States where satellite transformer stations rebroadcast signals from other stations. The petition stresses the anomaly of a deleting network programming of a station carried by one of the petitioners for 23 years in order to protect a signal showing spot advertisements for an area where their cable viewers never regularly shop, dine, or go to a theater although they do go to the places advertised by the "distant" deleted affiliate.[7]
 
 
 29
 The National Cable Television Association filed a comment in support of the Petition for Reconsideration. It states that the anomaly of satellite stations is not the only one created by zones of blackout protection surrounding affiliates, and that the burden of obtaining regulatory protection should be placed upon the entity seeking it.[8]
 
 
 30
 The Commission granted reconsideration and reversed its prior order. Memorandum Opinion and Order Docket 19995, 67 F.C.C.2d 1303 (March 22, 1978). It did so by adopting the "significantly viewed" test as its definition of "local station" for both its carriage and blackout rules, thereby requiring the station seeking blackout protection to prove its need for it. This order states,
 
 
 31
 The issue here is one of balancing. On one side is the concern that a station be available in full on the cable where it is available (via antenna reception). On the other side is the traditional concern about economic impact to local broadcasting. In the Third Report and Order, the Commission attempted to balance these factors. The difficulty here is that both stations involved, the one claiming priority and the one whose programming is being deleted, are "local" stations. They generally are competitors over-the-air, and we consider them both so local in nature that our rules mandate their carriage on the cable system.
 
 
 32
 Our action here merely shifts the burden of proof. Where a signal is significantly viewed, we shall give it full local status for purposes of cable carriage. Naturally, an aggrieved station can obtain protection via our special relief procedures. As such, the burden now has shifted to the broadcast licensee seeking (blackout) protection against a significantly viewed signal. A petitioning licensee will be expected to present persuasive justification. Insofar as economic impact is concerned, this shifts the burden to the party possessing the licensee financial information.
 
 
 33
 Id. at 1305. Two dissenting and two concurring opinions were issued by the Commissioners.
 
 
 34
 The public response to this order was significant. Twenty-one petitions for reconsideration of this reconsideration order were received along with seven comments in support of those petitions. Twenty-three comments were made in opposition to those petitions.
 
 
 35
 Four months later, the Commission issued an order refusing to reconsider its amendment of the blackout rules. Memorandum Opinion and Order Docket 19995, F.C.C. 78-597 (August 8, 1978). The order discusses many substantive issues raised by the parties. It discusses whether notice of its action was effectively given and concludes that the parties had a full opportunity to participate in the debate of Docket 19995 in five separate pleading cycles. It notes, in any event that the rule adopted "was clearly 'foreshadowed in proposals and comments advanced during the rule-making.' South Terminal Corp. v. EPA, 504 F.2d 646, 658 (1st Cir. 1974)." Id. at p. 7; Appendix, 104.
 
 VI. DISCUSSION
 
 36
 Spartan contends that the Commission's final rule was adopted without adequate notice and fair opportunity for public comment, contrary to the Administrative Procedure Act, 5 U.S.C. § 553. Cf. United States v. Florida East Coast Railway Company, 410 U.S. 224, 241, 93 S.Ct. 810, 819, 35 L.Ed.2d 223 (1973). Also, Spartan argues that the Commission should be reversed for its failure to provide a reasoned explanation for the "abrupt" reversal of its prior policy. It is argued that the Commission failed to consider and weigh relevant factors and failed to explain the reasons it was rejecting views opposing its decision. In all, it is argued that the Commission's procedures point to the arbitrariness of the final decision.
 
 
 37
 The Administrative Procedure Act, with some exceptions, requires an agency to give advance warning of proposed informal rulemaking by publishing in the Federal Register a notice containing, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). This notice requirement encourages participation in the proceeding and helps ensure informed agency decisionmaking. See, e. g., American Iron and Steel Institute v. EPA, 568 F.2d 284, 291 (3d Cir. 1977); Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3d Cir. 1969).
 
 
 38
 Unfairness results unless persons are "sufficiently alerted to likely alternatives" so that they know whether their interests are "at stake." South Terminal Corp. v. EPA, 504 F.2d 646, 659 (1st Cir. 1974). In cases where an administrative agency has failed to give the public advance notice of the scope of its proceedings, courts have invalidated the decisions made. E. g., American Iron & Steel Institute v. EPA, 568 F.2d at 291. (Agency notice identified one variety of steel processing under consideration but regulations covered two varieties thereby affecting a different group of manufacturers); Maryland v. EPA, 530 F.2d 215, 221-22 (4th Cir. 1975), rev'd on other grounds sub nom. EPA v. Brown, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977) (Agency adopted regulations proposed in a published notice applicable to a different administrative proceeding); Rodway v. United States Department of Agriculture, 514 F.2d 809, 814 (D.C.Cir.1975) (Notice encompassing rules for the administration of food stamp program did not give sufficient notice of a change in the amount of coupons to be allotted to recipients). Also, an agency decision which is made in reconsideration of a final order has been overturned for failure to give published notice of the fact of its renewed deliberations. Arlington Oil Mills, Inc. v. Knebel, 543 F.2d 1092, 1098-99 (5th Cir. 1976).
 
 
 39
 However, the Act "does not require an agency to publish in advance every precise proposal which it may ultimately adopt as a rule." California Citizens Band Association v. United States, 375 F.2d 43, 48 (9th Cir. 1967). As we recently stated in Consolidation Coal Co. v. Costle, 604 F.2d 239, 248 (4th Cir. 1979),
 
 
 40
 (N)otice of proposed rulemaking must be sufficient to fairly apprise interested parties of the issue involved . . . , but it need not specify every precise proposal which (the agency) may ultimately adopt as a rule. Moreover, the requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions. (Footnote and citations omitted.)
 
 
 41
 Further, an agency is not prohibited from changing its mind. "(F)aced with new developments or in light of reconsideration of the relevant facts and its mandate, (the agency) may alter its past interpretation and overturn past administrative rulings and practice." American Trucking Ass'ns, v. Atchinson, Topeka and Santa Fe Railway Co., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967).
 
 
 42
 We think Spartan's contentions are meritless in light of the scope and nature of the proceedings before the Commission.
 
 
 43
 Many television broadcast stations and cable companies are long-time foes in their attempts to hold sway over the single regulatory authority governing their mutually conflicting interests. E. g., Wheeling Antenna Company v. United States, 391 F.2d 179 (4th Cir. 1968); Winchester T.V. Cable Co., 462 F.2d 115 (4th Cir. 1972).
 
 
 44
 Since its first promulgation of network blackout rules, the Commission has expressed concern over the deletion of programming which is available to viewers via antenna reception. The proceeding before us commenced in 1974 with a comprehensive review of blackout rules as a follow-up to the Commission's adoption of a regulatory program for cable television systems. The initial rulemaking notice specified the problem of deletion of a competing local signal as one for special comment. It acknowledged the inconsistency of its mandatory carriage rules and its blackout rules. The first order in the proceeding singled this problem out for continued proceedings apart from others at issue.
 
 
 45
 In the Third Report and Order, the Commission decided to continue its mileage zones of protection around each affiliate because it could develop no workable general rule for an exception for local competitors. Each possible standard created as many problems as it solved. The Commission acknowledged that adjudicatory proceedings for special relief, on a case-by-case basis, could best alleviate the harsh and more unreasonable consequences of its blackout rules. Effectively, it was decided that the parties aggrieved by the blackout rules should prove a negative that the protected station did not need protection. On reconsideration, the Commission decided to create a rule favoring all possible local competition. It requires stations claiming a need for regulatory protection against signals which arguably are available in the surrounding area to prove their need for a blackout.
 
 
 46
 We think the notice of the Commission's deliberations over the alternative selected was sufficient. Any surprise worked upon petitioner arises from the success of the opponent's arguments, rather than from any claimed failure of notice about their consideration. We think the Commission's deliberations and its ultimate decision were well within its administrative authority and regulatory expertise.
 
 
 47
 Finally, in a separate matter presented in a consolidated appeal, Henson Aviation, Inc., a television station broadcaster, contends that one provision of the Commission's last order is vague. It concerns special relief previously granted to Henson and is the subject of a petition for clarification filed by Henson with the Commission. We think our review of this variance provision here would be premature. E. I. du Pont de Nemours & Co. v. Train, 541 F.2d 1018, 1028 (4th Cir. 1976), aff'd on this ground, 430 U.S. 112, 128, n.19, 97 S.Ct. 965, 975, n.19, 51 L.Ed.2d 204 (1977). Cf. National Crushed Stone Ass'n v. EPA, 601 F.2d 111, 122-123 (4th Cir. 1979).
 
 
 48
 The stay of the Commission's final rule pending this appeal is vacated and the petition to set aside the Commission's order is denied.
 
 
 49
 PETITION DENIEDSPROUSE, Circuit Judge, dissenting:
 
 
 50
 It is arguable whether the F.C.C. has met the standards for notice required by 5 U.S.C. 553(b)(3). That standard requires that "the parties had fair notice of exactly what the Commission proposed to do, and were given an opportunity to comment, to object or to make some other form of written submission." U. S. v. Florida East Coast R. Co., 410 U.S. 224, 241, 93 S.Ct. 810, 819, 35 L.Ed.2d 223 (1973).
 
 
 51
 If this were the only shortcoming of the agency's procedures, I could be persuaded, nevertheless, in view of the representative industry participation in previous hearings to agree with the majority opinion concerning the adequacy of notice. The manner in which the Commission abruptly effected a reversal of position, however, demonstrates a total failure to engage in reasoned decision-making, and I am compelled to dissent.
 
 
 52
 Agencies are competent to change their position in light of new developments and reconsiderations, but such a change creates a duty to explain departures from prior norms. The Supreme Court in Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973), stated:
 
 
 53
 Whatever the ground for the departure from prior norms; it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.
 
 
 54
 Such a standard of agency action has not been met by the Commission.
 
 
 55
 The initial nonduplication rules were established in the Commission's First Report and Order in Dockets 14895 and 15233, 38 F.C.C.2d 683 (1965). This rule-making with respect to a possible change in significantly-viewed signal policy began with the Notice of Inquiry and Proposed Rule Making, Docket 19995, 46 F.C.C.2d 1164 (April 3, 1974). As a result of this notice the Commission took the position in its First Report and Order, Docket 19995, 52 F.C.C.2d 519, 537 (1975):
 
 
 56
 In short, the designation of a signal as being significantly viewed is, by itself, inadequate to exempt it from our nonduplication rules. We recognize, however, that there may be situations in which the network programming of such signals should not be deleted. Accordingly, we intend in the near future to develop a standard so that such signals are not subject to deletion.
 
 
 57
 To develop this implied exceptions standard, the Commission then issued its Further Notice of Proposed Rule Making, Docket 19995, 40 Fed.Reg. 34395 (1975). The stated purpose of this notice was: "to set a standard which will prevent those television signals, commonly viewed in noncable households of a cable community, from being blacked out because of mileage priorities." (emphasis added). Id. at 34396.
 
 
 58
 This "commonly viewed" standard was stated to include stations at least significantly viewed and, in all probability, consisting of stations that are both significantly viewed and which have a share of total viewing hours equal to or greater than a protected signal.
 
 
 59
 Wide participation from the industry resulted. The Further Notice was followed by the Third Report and Order in Docket 19995, 62 F.C.C.2d 99 (Nov. 17, 1976) which rejected the proposed rule changes on the traditional basis of fear of adverse local television impact.
 
 
 60
 The comments have made it clear to us that there are significant risks to local broadcast service inherent in the rule change proposed and that there is no substantial advantage to cable subscribers in terms of service they receive. . . .
 
 
 61
 62 F.C.C.2d at 102.
 
 
 62
 In adopting special individual relief procedures, the Commission stated that the "situations which led us to adopt the Further Notice are so diverse that they simply cannot be treated by a single across-the-board standard." 62 F.C.C.2d at 102.
 
 
 63
 Subsequently, the Moscow-Pullman petition for reconsideration was filed and noticed in December, 1976. The specific relief requested by Moscow-Pullman was an exception in the rules allowing nonduplication rights to satellite stations.[1] This petition drew comments from only three parties. This, arguably at least, was due to the limited, specific relief requested.
 
 
 64
 Following a long delay, the Commission released their Memorandum Opinion and Order, Docket 19995, 67 F.C.C.2d 1303, on March 22, 1978. The Commission, in short form, reversed its past positions, granted significantly viewed stations full status as local stations, and exempted their stations from "blackout" or nonduplication rules. The sole justification stated in the three page memorandum was:
 
 
 65
 In the Third Report and Order, the Commission in balancing the factors, used in the traditional framework of local station versus distant station, deciding that the local station should be protected absent grounds for waiver. On reconsideration, we believe it is more accurate to view this as a local station versus local station situation.
 
 
 66
 Id. at 1305.
 
 
 67
 The role of an appellate court is to review rulemaking decisions on the basis of the relevant factors present and to determine whether the agency has "articulated a rational connection between the facts found and the choice made." Office of Communication v. F.C.C., 560 F.2d 529 (2nd Cir. 1977). Shifts in agency position are permissible but the court must inquire "whether the Commission articulated with reasonable clarity a rational basis for its change of view." Larus & Brother Co. v. F.C.C., 447 F.2d 876, 879 (4th Cir. 1971); See also Columbia Broadcasting System, Inc. v. F.C.C., 454 F.2d 1018, 1026 (D.C.Cir.1971); Greater Boston Television Corp. v. F.C.C., 444 F.2d 841 (D.C.Cir.1970). The caveat to permissible agency latitude so well stated in Greater Boston Television Corporation v. F.C.C. forcefully casts these proceedings into proper perspective. The Court, in discussing when court intervention is proper, states supervision is necessary
 
 
 68
 not merely in case of procedural inadequacies, or bypassing of the mandate in the legislative charter, but more broadly if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a "hard look" at the salient problems, and has not genuinely engaged in reasoned decision-making. . . ., If satisfied that the agency has taken a hard look at the issues with the use of reasons and standards, the court will uphold its findings, though of less than ideal clarity, if the agency's path may reasonably be discerned. . . .
 
 
 69
 Id. at 851.
 
 
 70
 The Commission's previous rules and policies were emphatic. There would be "significant risk" in treating significantly viewed distant stations as local stations. It now accepts treatment in that exact manner but does not explain how the risk is diminished or why the Commission's views as to risk have changed. In April, 1975, there was inadequate reason for the rule put into effect in March, 1978, without explanation of the changing circumstances that now makes the rule advantageous. In November, 1976, the situation was so diverse as to defy inclusion in one rule. It was then adopted in March, 1978, without explanation as to how the problem became sufficiently unified so that it could be governed by the single rule.
 
 
 71
 An agency changing its past precedence has a stricter duty of articulation in rule-making than in the initial rule formulation. Although a change is permissible,
 
 
 72
 an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.
 
 
 73
 Greater Boston Television Corp. at 851.
 
 
 74
 The deficiency of the notice, the emphatic absolutism of its prior rulings, the short time lapse between the change in the rule, the abrupt, brief and essentially unexplained final decision of 1978, signal that the Commission based its final decision on substantive reasons not available for review by this Court, and it is not possible to discern the agency policy effecting its decision.
 
 
 75
 It is true that if this case were remanded, the F.C.C. might well display evidence not previously discussed or might sufficiently articulate its changed reasoning on some other basis and promulgate anew the same rule. On the other hand, forced to such articulation, it might not be capable of sustaining its reasoning. We may well surmise that the agency had a reasonable basis for regulating competition between broadcast television stations and cable television stations but Congress has placed the responsibility of determining a reasonable basis on the F.C.C. not on the basis of surmise, but on the basis of deliberate fact-finding and reasoned decision making.
 
 
 76
 I respectfully dissent.
 
 
 
 [1]
 We emphasize that the ruling at issue only affects blackout protection in areas where non-cable competition exists. The Commission's blackout rules continue to protect station affiliates from duplicating network programming which is unavailable to a significant portion of the viewer market in the affiliates' surrounding areas
 
 
 [2]
 The data used to substantiate these ratings are collected on a county-wide basis and do not show actual viewing patterns in any particular cable community
 
 
 [3]
 Later, in the fall of 1975, the Commission issued two orders in Docket 19995, neither of which dealt with the problem of cable blackouts of locally competing signals. Second Report and Order in Docket 19995, 54 F.C.C.2d 229 (1975); Memorandum Opinion and Order in Docket 19995, 56 F.C.C.2d 210 (Oct. 8, 1975). The Memorandum Opinion expressly notes that a separate rulemaking proceeding to set a standard to exempt some locally competing signals were continuing pursuant to the "Further Notice." Id at 220-21. See also, CBS Television Network Affiliates Association v. F.C.C., 555 F.2d 985 (D.C.Cir.1977)
 
 
 [4]
 The order states the problem as follows,
 A cable operator may carry any significantly viewed signal and indeed he must carry it upon request of the station. Many parties commenting in the First Report proceeding argued that since the Commission had recognized that these are local signals it was inconsistent to require large portions of their programming to be deleted on the grounds that they are "distant." The result is that cable system operators are required to black out and cable television subscribers are precluded from viewing signals that are arguably readily available off-the-air. It was urged that the Commission's nonduplication rules should not operate to deny cable subscribers the right to view television signals commonly viewed by neighboring noncable households.
 Id. at 100.
 
 
 [5]
 The order defines the nature of the showing needed for special relief to prevent blackout of a locally competing signal,
 Among the factors we would consider particularly important in any waiver proceeding are: whether the (distant) station enjoys a high level of viewership off-the-air, the financial health of the (protected) station, whether the (protected or distant) stations, in their local programming, have specially undertaken to serve the community in question and whether members of the public are being forced to watch an inferior quality picture on the cable when a good quality one would be available absent our (blackout) rules. . . . We are hopeful that by allowing flexibility and experimentation in the manner of proof, a workable set of procedures will be found that is generally acceptable. Since our concern is over public inconvenience, subscriber dissatisfaction is one factor which would obviously be relevant. Parties, however, are urged to document all showings in as much detail as possible so as to avoid disputes over the actual facts involved.
 Id. at 102-03.
 
 
 [6]
 The table is captioned "Federal Communication Commission Report No. 1023, Petitions for Reconsideration of Actions in Rule Making Proceedings Filed Dec. 30, 1976." The table shows "Docket No. 19995, Rule No. Sub. E, pt. 76, Amendment of Sub. F of pt. 76 of the Commission's rules and regulations with respect to network program exclusivity protection by cable television systems." (App. 89)
 
 
 [7]
 The petition argues forcefully,
 Which of the two markets, then, is local!
 The new rules work results that are unnecessary to broadcast television's (needs. They) have an unfortunate fallout on the cable public and on the systems that serve them in (our cable communities). In this circumstance, the effect of regulation seems oppressive and nothing more than unnecessary nuisance.
 The petitioner believes that the Third Report and Order should be reconsidered. Reduced to basics, the Commission formulated its significant viewing test specifically to provide a precise standard of actual area viewing. . . . But, now, with (its rigid fixed mileage zones of protection around each affiliate, it has allowed a theoretical model) to prevail over real world viewing. And all in the name of protecting the poor (TV station) against the rich (TV station).
 The petitioner does, however, recognize the tone of finality in the Third Report and Order. Accordingly, it requests that the Commission take another look at dealing with one piece of the problem. As suggested (above), a rule of general applicability as to satellites would reflect viewer and public tastes, would not seriously diminish the rationale of protecting poor, struggling over-air stations, would avoid results that have little or nothing to do with nourishing localism (results that, perhaps, are antilocal because of the discouragement to the (deleted) station to aim at the cable community market). (FCC) Chairman Wiley, in his gracious address of December 3, 1976 to the Western Cable Convention in Anaheim, labeled the Commission's reevaluation of the cable program as an effort "to effect changes which are consistent not with some abstract or bureaucratic model but, instead, with the needs and interests of our citizens and with the practical realities of the marketplace." The inadvertencies of the (zone of protection rules based on mileage) are, surely, a sour entry in that diary.
 Appendix, 194-96.
 
 
 [8]
 This comment reads, in pertinent part,
 To remedy inequitable situations, the Commission has suggested use of its special relief procedures. . . . Pursuant to the Commission's scheme, cable operators must bear the burden of proof of showing why a signal which is viewed off-the-air without benefit of a cable system should not be blacked out on the cable system. It is ludicrous for the Commission to establish, on the one hand, its significantly viewed test (to define which stations are so "local" as to require their carriage by cable systems) . . . and on the other hand require a station which meets the test to be blacked out. The absurdity is heightened by the fact that the blackout can be ordered to protect a station which may, in fact, not be "local."
 The burden of proof under these circumstances should always be placed upon that entity which is seeking regulatory protection. This is doubly true in this instance where protection is sought against what is available off-the-air as a result of the Commission's own (license) allocation plan.
 Appendix, 198.
 
 
 [1]
 Satellite stations merely simultaneously rebroadcast programs of a distant parent station