# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-SA-01300-SCT

*SHERMAN BOYLES, ET AL.*

*v.*

*MISSISSIPPI STATE OIL & GAS BOARD, MURPHY OIL USA, FINA OIL & CHEMICAL COMPANY, VINTAGE PETROLEUM, INC., UNION PACIFIC RESOURCES, EXXON, MOBIL, AMOCO CORPORATION AND MARATHON OIL COMPANY, SUCCESSOR TO TXO PRODUCTION*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/01/1999 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | STUART H. SMITH |
| | JAMES R. COX |
| ATTORNEYS FOR APPELLEES: | TIM WAYCASTER |
| | EDWIN S. GAULT |
| | JEFFERY P. REYNOLDS, P.A. |
| | TERI D. GLEASON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 02/01/2001 |
| MOTION FOR REHEARING FILED: | 2/15/2001; denied 9/13/2001 |
| MANDATE ISSUED: | 9/20/2001 |

**BEFORE BANKS, P.J., SMITH AND COBB, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. This appeal arises from administrative hearings before the Mississippi State Oil and Gas Board ("the Board"). As a result of those hearings, the Board, acting in its rulemaking capacity, promulgated Oil and Gas Board Statewide Rule No. 69 ( "Rule 69" or "the Rule") regarding control of oilfield Naturally Occurring Radioactive Materials ("NORM"). On May 17, 1996, appellants filed their appeal of the Board's order promulgating Rule 69 to the Chancery Court of the First Judicial District of Hinds County, Mississippi. The appeal was denied by order of the court dated July 1, 1999, from which this appeal follows. Finding that the Board's order promulgating Rule 69 was founded on substantial evidence, was neither arbitrary nor capricious, was within the authority of the Board, and was not a violation of some constitutional or statutory right, we affirm the judgment of the chancery court.

## FACTS

¶2. Since at least 1962, the Mississippi Department of Health, through various agencies including the Division of Radiological Health, has regulated sources of radiation. In 1995, the Mississippi Legislature passed a number of statutory changes to address the problem of oil field NORM which arises as a byproduct of oil exploration & production. Through these changes, the Legislature made the regulation of

NORM the exclusive province of the State Oil and Gas Board:

> Notwithstanding any other provision contained in the Laws of the State of Mississippi, the Board shall have exclusive jurisdiction and authority, and it shall be its duty, to make, after notice and hearings as hereinafter provided, such reasonable rules, regulations, standards and orders, and to issue such permits as may be necessary, to regulate the use, management, manufacture, production, ownership, investigation and non-commercial disposal of oilfield exploration and productive wastes in order to prevent, eliminate or reduce waste by pollution to acceptable levels in order to protect the public health, safety and the environment.

Miss. Code Ann § 53-1-17(7) (1999). The Legislature amended the definition of "oilfield exploration and production wastes" to include "naturally occurring radioactive . . . substance." Miss. Code Ann.§ 53-1-3(t)(i) (1999). Rule 69 was promulgated pursuant to the legislative mandate codified at Miss. Code Ann. § 53-1-17(7).

¶3. From the end of August through the beginning of September of 1995, the Board provided public notice that a hearing would be conducted to discuss the regulation of NORM. The hearing was postponed and ultimately held April 2-4, 1996. In the interim, the Board conducted exploratory committee meetings to investigate the various concerns surrounding oil field NORM. This rulemaking process consisted mainly of consultations with Carol D. Berger, an expert in the field, and with the Department of Health. Through this process, the Board drafted a proposed rule to address the regulation of NORM.

¶4. At the public hearing, the Board received arguments and opinions from representatives of the oil industry as well as from landowners and others with environmental concerns. Representatives of various oil and gas industry organizations and corporations appeared at the hearings and encouraged the Board to adopt a Rule that was less stringent than the one that had been proposed because they believed a less stringent rule would still be fully protective of public health and the environment. Representatives of various landowners and other interested parties appeared before the Board and argued that the Board should adopt a rule more stringent than the one proposed; they believed that Rule 69 as proposed by the Board would not adequately protect the public health and environment. After considering the testimony of a number of experts, the Board passed an order adopting the present form of Rule 69 regulating the handling, dispersion, and other disposition of oil field NORM.

¶5. Aggrieved by the chancery court's denial of the relief requested, the appellants appeal to this Court and assign the following issues as error:

> **I. WHETHER THE PROMULGATION OF RULE 69 WAS ARBITRARY AND CAPRICIOUS BECAUSE IT WOULD CAUSE THE VIOLATION OF FEDERAL LAW, AS SET FORTH IN THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT ("CERCLA"); THE RESOURCE CONSERVATION AND RECOVERY ACT ("RCRA"); AND THE OCCUPATIONAL SAFETY AND HEALTH ACT ("OSHA").**

> **II. WHETHER THE PROMULGATION OF RULE 69 WAS ARBITRARY AND CAPRICIOUS BECAUSE THE ASSUMPTIONS UPON WHICH IT IS BASED ARE INVALID.**

**III. WHETHER RULE 69 SHOULD BE DECLARED INVALID BECAUSE THE RULEMAKING PROCESS WAS TAINTED BY EX PARTE CONTACTS.**

**IV. WHETHER DURING THE RULEMAKING PROCESS THAT CULMINATED IN THE PROMULGATION OF RULE 69, APPELLANTS WERE DEPRIVED OF THEIR DUE PROCESS RIGHTS.**

**V. WHETHER THE PROMULGATION OF RULE 69 WAS PROCEDURALLY DEFECTIVE BECAUSE THE BOARD NEITHER SOUGHT NOR RECEIVED THE APPROVAL OF THE MISSISSIPPI COMMISSION ON ENVIRONMENTAL QUALITY BEFORE PROMULGATING THE RULE.**

<u>STANDARD OF REVIEW</u>

¶6. This Court has clearly pronounced the appropriate standard for reviewing appeals of administrative agency actions. A reviewing appellate court will not disturb the findings of an administrative agency unless the agency's action (1) was unsupported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of an administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party. *Mississippi Employment Sec. Comm'n v. Harris*, 672 So.2d 739, 741 (Miss. 1996); *Mississippi Comm'n on Envtl. Quality v. Chickasaw County Bd. of Supervisors*, 621 So.2d 1211, 1215 (Miss. 1993). *McGowan v. Mississippi State Oil & Gas Bd.*, 604 So.2d 312, 317 (Miss. 1992). The Court has further stated that "[e]xperience and reflection reveal considerable overlap among these grounds, as none of the four represent a discrete legal compartment, nor is any susceptible of a regimen of mechanical jurisprudence." *Id.* at 317.

¶7. While an appellate court may review pure issues of law de novo, *Montalvo v. Mississippi State Bd. of Med. Licensure*, 671 So.2d 53, 55 (Miss. 1996); *McGowan*, 604 So.2d at 317, the more typical review of an administrative agency's order requires a determination of whether there is substantial evidence in the record to support the agency's factual findings. That is the exercise this Court now faces. Under such circumstances, it is well settled that this Court looks to see if the agency's decision was supported by substantial evidence, or if it was arbitrary and capricious, beyond the power of the agency, or in violation of some constitutional or statutory right of the complaining party. *Montalvo*, 671 So.2d at 55-56; *Mississippi Bd. of Nursing v. Wilson*, 624 So.2d 485, 489 (Miss. 1993); *Mississippi State Tax Comm'n v. Mississippi-Ala. State Fair*, 222 So.2d 664 (Miss. 1969). There is a rebuttable presumption in favor of the agency decision, and the burden of proof is on the party challenging that decision. *Montalvo*, 671 So.2d at 56; *Wilson*, 624 So.2d at 489. This Court "give[s] due deference to the factual findings of the administrative agency and to the chancellor who adopted the same findings." *Montalvo*, 671 So.2d at 56 (quoting *State Farm Ins. Co. v. Gay*, 526 So.2d 534, 535 (Miss. 1988)).

¶8. An appeal from an administrative agency is limited. *Mainstream Sav. & Loan Ass'n v. Washington Fed. Sav. & Loan Ass'n*, 325 So.2d 902, 903 (Miss. 1976). Appellate review of an agency decision is limited to the record and the agency's findings. *Chickasaw County*, 621 So.2d at 1216; *Mississippi Employment Sec. Comm'n v. PDN, Inc*. 586 So.2d 838, 840 (Miss. 1991). The reviewing court cannot substitute its judgment for that of the agency or reweigh the facts of the case. *Chickasaw County*, 621 So.2d at 1216. A decision supported by substantial evidence will not be overturned; only where the decision is arbitrary and capricious will the courts intervene. *Montalvo*, 671 So.2d at 56; *State Bd. of Psychological Examiners v. Hosford*, 508 So.2d 1049, 1054 (Miss. 1987).

# ANALYSIS

## I.

¶9. The appellants first argue that the promulgation of Rule 69 was arbitrary and capricious because it would cause the violation of federal law, as set forth in the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), the Resource Conservation and Recovery Act ("RCRA"), and the Occupational Safety and Health Act ("OSHA"). Their arguments concerning what they contend to be violations of federal law resulting from the Board's passage of Rule 69 are raised for the first time in these proceedings. While appellants mentioned CERCLA at the hearings before the Board, it was simply in an effort to compare the standards set forth in Rule 69 to those provided in CERCLA. OSHA standards were mentioned in the their briefs filed in support of their appeal of Rule 69 to the chancery court; however, the appellants only argued that warning signs required by Rule 69 are not the same as those required under OSHA.

¶10. It is a well-settled proposition that this Court will not review matters on appeal that were not considered by the lower court. *One (1) 1979 Ford 15V v. State ex rel. Miss. Bureau of Narcotics*, 721 So.2d 631, 637 (Miss. 1998); *Ditto v. Hinds County*, 665 So.2d 878, 880 (Miss. 1995). With the exception of the warning signs previously mentioned, the appellants' arguments concerning violations of federal law were not raised as issues on appeal in the chancery court. Moreover, most, if not all, private causes of action created by those federal statutes are federal court causes of action, and, to the extent any of them could even arguably be heard in state court, they certainly would not be heard by this Court as a court of first impression.

¶11. Even if appellants had preserved these federal law arguments for appeal, they have done nothing to show that the Board's adoption of Rule 69 was a violation of any federal law. Both Dr. Vern Rogers, who testified on behalf on the Rule as proposed by the Board as an independent expert retained by the Board, and Carol D. Berger, who participated in the development of the Rule as originally proposed, testified at length concerning the reasonableness of the standards provided in Rule 69. The entirety of the testimony given by each of them, both on direct examination and under cross-examination, was that the Rule, as proposed, was fully protective of the public health and the environment. In fact, Berger's testimony was that she believes the Rule could be even less stringent and still be fully protective of the public health and the environment. During his testimony, Dr. Rogers pointed out some specific inaccuracies in appellants' position concerning Rule 69 standard being below federal standards. The only portion of the record that even arguably amounts to an effort by the appellants to raise the issue of the applicability of any of these federal laws is found in an exchange between the lawyers and not in testimony elicited from any witnesses. When pressed on the issue, counsel for appellants admitted that CERCLA does not apply to the control of NORM in the manner dealt with by Rule 69.

¶12. Clearly, there was more than substantial evidence in the form of expert testimony before the Board to suggest to the Board that the Rule it adopted was not a violation of any federal law. Moreover, appellants have not put this Court in a posture to require it to analyze the federal laws and apply them to this case. They have not developed these arguments through their own expert testimony as part of the record and are raising them before this Court for the first time.

## II.

¶13. Appellants contend that the Board made several invalid assumptions in arriving at its determination that Rule 69 was fully protective of the public health and the environment. Primarily, the appellants argue that the experts relied upon by the Board used faulty assumptions in calculating the exposure rate one would encounter at a NORM-contaminated site. The Board's experts calculated that the proposed rule would result in an exposure rate of 100 millirems per year for a person living on a NORM-contaminated site, while the appellants argue that the rate would be higher. The Board's assumption was supported by substantial amounts of expert testimony presented to the Board during the public hearings.

¶14. At the hearing on the promulgation of Rule 69, the Board heard testimony from its own expert, Dr. Vern Rogers who has a Ph.D. in Nuclear Engineering from the Massachusetts Institute of Technology. Dr. Rogers testified that in developing Rule 69, 100 millirems per year was adopted as the acceptable standard. When questioned as to where he got this standard, Dr. Rogers stated that 100 millirems per year is the acceptable standard of exposure as designated by the Mississippi Department of Health. The Board also considered Carol D. Berger's testimony. Berger, a certified health physicist with expertise in health physics and radiation physics, gave a series of examples of the levels of exposure people encounter in daily life and how those levels compare to the 100 millirems per year exposure level contemplated by Rule 69. For instance, because of the altitude of Leadville, Colorado, residents are exposed to about 700 millirems of radiation per year just by living in that city. According to Berger, an average cigarette smoker is exposed to about thirteen times the 100 millirems per year level established by Rule 69. The average nuclear brain scan done as a routine diagnostic procedure exposes the patient to about 500 millirems at one instance. Berger also made the point that someone taking about thirty-five cross-country flights in one year would be exposed to 100 millirems of radiation, the same level as in Rule 69. In fact, she made the point that the National Council on Radiation Protection has a mediation target level of five hundred millirems per year-five times that contemplated by Rule 69.

¶15. The Board also heard Dr. John W. Scott, Chief of Nuclear Medicine at the Veteran's Administration Hospital in Birmingham, Alabama. Dr. Scott testified to the negligible adverse health effects he has observed in administering high doses of radiation in a variety of nuclear medical procedures. His testimony was that the dose levels routinely used in nuclear medicine treatments are often thousands of times greater than those exposure levels contemplated under Rule 69.

¶16. The Board also heard testimony from Dr. Tate Thigpen, a board-certified oncologist at the University of Mississippi Medical Center. Dr. Thigpen testified that he was unaware of any scientific study having demonstrated any observable adverse health effects on humans from radiation below a dose of 50,000 millirems per year. In particular, Dr. Thigpen testified that an exposure rate of 10,000 to 20,000 millirems per year represented a conservative level below which adverse health effects would be medically insignificant.

¶17. The appellants' experts, on the other hand, testified that in order to adequately safeguard the public, much more stringent exposure criteria than those proposed by Dr. Rogers were necessary. The appellants point to the opinion of their expert, Dr. Marvin Resnikoff, who used different assumptions in his calculations. By Dr. Resnikoff's calculations, the proposed rule would result in an exposure rate of 157 millirems per year.

¶18. Based on the testimony of the various experts, the Board found that "100 [millirems] maximum exposure levels contemplated in Rule 69 is a scientifically and medically conservative level which will

provide protection for the citizens of Mississippi regardless of age from any harmful exposure to radioactive materials." The Board was compelled by the fact that the testimony of Drs. Scott and Thigpen was the only credible medical testimony addressing concerns and issues raised by the Rule as to the impact and effects the Rule's maximum allowable levels would have on humans. The Board specifically found in its order that it considered all of the testimony in arriving at the version of Rule 69 which was eventually adopted.

¶19. In addition to the appellants' argument that the 100 millirems per year standard is an erroneous assumption, they also argue that other assumptions used by Dr. Rogers, Ms. Berger, and the Board at arriving at the 100 millirems per year standard were likewise erroneous. Again, the appellants argue that their experts and proof more persuasive than that of the appellees in the hearing before the Board.

¶20. The appellants argue that proponents of the Rule have ignored sludge in their hypothetical waste in order to reduce exposure estimates. Dr. Rogers explained that sludges are commonly dealt with in the oilfield by containing them in separate pits until permanently disposed offsite. The stated purpose of Rule 69 is to deal with oilfield NORM while it exists in the oilfield during operations and not to deal with the disposal of oilfield NORM In Dr. Rogers's expert opinion, his assumptions with regard to emanation rates from sludges not contributing to the overall dose rate were reasonable. Again, the appellants' experts disagree with Dr. Rogers, creating a conflict between the experts which the Board resolved after hearing all the testimony.

¶21. Another such assumption that the appellants claim to be erroneous is the assumption that the ratio of radium-226 to radium-228 is oilfield NORM in Mississippi is 1:1. However, Dr. Rogers testified that he reasonably relied on Berger's knowledge and experience on that point and adopted her assumption that the ratio is 1:1. Berger defended the assumption in her testimony and gave specific technical support for it. She testified that, while there is evidence that radium components appear at various ratios in different parts of the State of Mississippi, it was reasonable and safe to assume a ratio of 1:1 as that was the maximum ratio possible.

¶22. The appellants also claim that the Board relied on erroneous assumptions with regard to how radiation should be measured. In support of that argument, they primarily cite the opinion expressed in comments before the Board by an outgoing head of the Mississippi Department of Health's Division of Radiological Health, Eddie Fuente. The appellants' contention that the Board did not consider Fuente's comments is simply not true. In fact, Dr. Rogers made it clear throughout his testimony that, in establishing the 100 millirens per year standard, he relied primarily on the fact that this was the exact standard used by the Division of Radiological Health- Fuente's agency. Apparently, Fuente disagreed with the standard his agency was applying. The version of the Rule that was adopted took into consideration the comments of Fuente and the other experts who testified.

¶23. In *Ohio Oil Co. v. Porter*, 225 Miss. 44, 82 So.2d 636 (1955), a party appealed a decision of the State Oil and Gas Board to this Court, arguing that its experts were more qualified and its proof more credible than that of the prevailing party. This Court held:

> All of the testimony hereinbefore referred to was opinion evidence by experts. The State Oil and Gas board accepted the testimony and opinion of the geologist introduced as a witness by the appellant. We are unable to say that the Board was manifestly wrong in so doing or that the testimony of this witness did not afford substantial evidence to support the orders of the Board. It is not for this Court to substitute its opinion for the opinion of the Board where the Board has reached its decision on

conflicting evidence and where its conclusions are supported by substantial evidence. . . Certainly we would not be justified on this record in holding that the Board acted capriciously or arbitrarily in reaching its decision. The expert witnesses were before the Board and the Board had the opportunity to observe them and to evaluate the weight of their testimony.

*Porter,* 225 Miss. at 60-61, 82 So.2d at 638 (emphasis added).

¶24. This Court is faced with an appeal quite similar to that presented in *Porter.* This Court is now asked to review an Oil and Gas Board Order which is clearly based on substantial expert testimony which more than supports the Board's Order. The complaining parties, the appellants herein, assert that the experts upon which the Board relied were not credible and the assumptions upon which their opinions were based were erroneous. It is true that the testimony of the appellants' experts differed from the appellees' experts. However, the Board heard the testimony of all those experts and evaluated the credibility of the various witnesses. Therefore, consistent with *Porter*, it is not the place of the reviewing court to substitute its judgment for that of the administrative agency. The Board's decision was supported by substantial evidence and the order promulgating Rule 69 was neither arbitrary nor capricious. This issue is without merit.

### III.

¶25. The appellants contend that the Board's interaction with Carol Berger, an expert in the field of health physics, and other contact with Mid-Continent Oil and Gas Association, an oil and gas industry lobbying group, amounted to ex parte contact in violation of the Board's procedural rule against such contacts and in violation of Mississippi Open Meetings Act and the Board's own procedural Rule No. 8.

¶26. The appellants' argument is primarily based on the Board's procedural Rule No. 8, entitled "Ex Parte Communications":

> After the announcement of, or notice of intention to contest any petition or application for relief submitted to this Board, there shall be no ex-parte contacts relating to the facts or merits of the petition between (a) any person acting on behalf of the petitioner or applicant for the relief desired or any person opposed to the application or petition and (b) any person with the state Oil and Gas Board of Mississippi who exercises any responsibility in relation to whether the application or petition is granted or denied.

Rule 8 of the Rules of Miss. St. Oil & Gas Bd. Appellants cite *Weeks Dredging & Contracting, Inc. v. Mississippi State Tax Comm'n*, 521 So.2d 884, 888 (Miss. 1988), for the proposition that administrative agencies may not violate their own regulations when to do so would deprive a party of a substantive benefit. They further rely on Mississippi Code § 25-41-5, entitled "Official Meetings of Public Bodies," which states, "All official meetings of any public body. . . are declared to be public meetings and shall be open to the public at all times." Miss. Code Ann. § 25-41-5 (1999).

¶27. In carrying out its legislative mandated function, the Board exercises two very different types of power. First, it carries out a quasi-judicial or "adjudicative" function as a delegation of power from the judicial branch of government. In exercising that power, it decides disputes between competing parties to a controversy specific to the parties' interests and in which neither the Board nor other parties have a stake.

The Board also carries out legislative or "rulemaking" functions as a delegation of power from the legislative branch of government. It does this function when, as is true in the case of the Board's adoption of rule 69, the Legislature directs the Board to enact rules or regulations on a particular subject within the Board's regulatory jurisdiction. The Legislature mandated that the Board promulgate rules and regulations governing oilfield NORM. Miss. Code Ann. § 53-1-17(7); Miss. Code Ann. § 53-1-3(t)(i).

¶28. This Court, as well as other courts, have recognized the distinction between adjudicatory and rulemaking functions of an administrative agency. In *Mississippi Pub. Serv. Comm'n v. Mississippi Power & Light Co.*, 593 So.2d 997, 1000 (Miss. 1991), this Court held, "the court refrains from interfering with duly delegated authority to an administrative agency, <u>particularly where the rule making power of an agency is involved due to its legislative function</u>." (emphasis added). In so ruling, this Court explained that the rule against interfering with duly delegated legislative authority is based upon separation of power considerations. *Id.* at 999-1000. This Court recognized that the creation of administrative agencies resulted in a combination of powers from all three branches of government. In order to maintain the appropriate checks and balances, the judicial branch of government must refrain from interfering with the portion of administrative agency's function that has been delegated by the legislative branch. *Id.* In *McDonald v. Watt*, 653 F.2d 1035 (5ᵗʰ Cir. 1981), a Fifth Circuit case arising out of Mississippi, the Fifth Circuit recognized the distinction between adjudication and rulemaking, stating:

> While the courts have experienced difficulty in articulating a "bright line" distinction between "rulemaking" and adjudication" *[see 2 K. Davis, Administrative Law Section 7:2 (2ⁿᵈ Edition 1979)]*, we have no doubt that the department properly used its adjudicatory procedures in resolving the dispute between the contestants. <u>The existence of a dispute concerning particular individuals is a distinguishing characteristic of adjudication</u>. *See United States v. Florida East Coast Railway Company*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973).

*Id.* at 1041-42 (emphasis added).

¶29. Here, the Board was clearly engaged in policy rulemaking pursuant to a specific delegation from the Mississippi Legislature. It was not adjudicating competing claims to a specific valuable right such as a permit to drill a well on a certain piece of property. The Board's Rule No. 8 on ex parte communications was clearly developed to govern adjudicatory hearings whereby the competing interests of parties could certainly be affected if one party has communications with the Board without the participation or knowledge of other parties. Such a rule cannot be applied in any reasonable or meaningful way to the rulemaking process. Moreover, it is a well-settled proposition that this Court refrains from interfering with the rulemaking function of an administrative agency. *Mississippi Pub. Serv. Comm'n*, 593 So.2d at 1000. Further, this Court held in *McGowan*, 604 So.2d at 320, that when there is a quasi-legislative dimension to the administrative process, the Board must consider all available evidence and opinions; any irregularities in the form of information submitted goes, at most, to the weight it should be accorded. *Id.* Therefore, this Court cannot hold that the Board tainted the rulemaking process by making ex parte contacts. It was entirely appropriate for the Board to seek input from any and all sources as it developed the proposed Rule 69. This issue is without merit.

## IV.

¶30. The appellants take general arguments concerning some of the allegations previously addressed such as alleged improper contacts between the Board and Carol Berger and Mid-Continent, as well as general

contentions that the Board was not impartial. In so arguing, they claim that their due process rights were denied.

¶31. The Constitution of the State of Mississippi states, "No person shall be deprived of life, liberty, or property except by due process of law." Miss. Const. art. 3, §14 (1890). The Fourteenth Amendment to the United States Constitution guarantees the same right. This Court has held that due process always stands as a constitutionally grounded procedural safety net in administrative hearings. *McGowan*, 604 So.2d at 318.

¶32. The appellants rely on *Morgan v. United States*, 304 U.S. 1, 58 S. Ct. 773, 82 L. Ed. 1129 (1938), to support their claims. *Morgan* involved an enforcement action whereby the federal government, through the United States Department of Agriculture, prosecuted individual providers of stockyard services for charging unreasonable rates. *Id.* at 1. The appellants rely on the following language used by the United States Supreme Court:

> We assume that the Secretary sufficiently understood its purport. But a "full hearing"-a fair and open hearing-requires more than that. The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies the opportunity; otherwise the right might be a barren one. Those who are brought into contest with the Government in a quasijudicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command.

*Id.* at 18 (emphasis added). In *Morgan*, the breach of due process arose out of the fact that Morgan entered the hearing without having been apprised of the true nature of the issues that were ultimately decided. In the case sub judice, appellants do not argue that they did not know the charges or issues, but rather that they did not know the identity of the rule's true proponents or the extent to which they had persuaded the Board to adopt it.

¶33. The appellants' reliance on *Morgan* points out the fundamental fault in their argument that the proceedings held before the Board in promulgating this Rule were flawed and that their due process rights were violated. In *Morgan*, the United States Supreme Court stated, "The proceeding had all the essential elements of a contested litigation, with the Government and its counsel on the one side and the appellants and their counsel on the other side." *Id.* at 20 (emphasis added). *Morgan* is clearly distinguishable from the fact situation before this Court as *Morgan* concerned adjudication, while the facts before this Court concern administrative rulemaking procedure. As discussed above, the procedures for rulemaking and adjudication differ.

¶34. Nothing in the procedures employed in the promulgation of Rule 69 violated the appellants' due process rights. The appellants' arguments arise from their misinterpretation of the nature of the proceedings as adjudicatory proceedings, the fact that certain procedural rulings were not to their likening, and the fact that the Rule, as eventually adopted, was not as stringent as they would have preferred. None of that amounts to a due process violation.

## V.

¶35. Appellants contend that the Board did not follow certain statutorily mandated procedures when

passing Rule 69. Specifically, they argue that the Board's order adopting Rule 69 should be reversed because the Board did not seek or receive the approval of the Mississippi Commission on Environmental Quality ("Commission") before adopting the Rule. For support, appellants cite Section 53-1-17(3)(a) of the Mississippi Code which states:

> The duty is hereby imposed on the State Oil and Gas Board to make suitable and adequate rules and regulations, subject to the approval of the Mississippi Commission on Environmental Quality, requiring the disposal of waste products such as, but not limited to, mud, acids, saltwater or any corrosive products brought to the surface from any oil, gas, or condensate well in this state, to prevent seepage, overflow or damage and injury to the topsoil or surface.

Miss. Code Ann. §53-1-17(3)(a) (1999) (emphasis added).

¶36. In their argument, the appellants fail to recognize the provision of Miss. Code Ann. § 53-1-17(7) which reads:

> Notwithstanding any other provision contained in the laws of the State of Mississippi, the board shall have exclusive jurisdiction and authority, and it shall be its duty, to make, after notice and hearing as hereinafter provided, such reasonable rules, regulations, standards and orders, and to issue such permits as may be necessary, to regulate the use, management, manufacture, production, ownership, investigation and noncommercial disposal of oil field exploration and production waste in order to prevent, eliminate or reduce waste by pollution to acceptable levels in order to protect the public health, safety and the environment.

Miss. Code. Ann. § 53-1-17(7) (1999) (emphasis added). "Oil field exploration and production waste" is defined to include "[a]ny liquid, gaseous, solid, naturally occurring radioactive, or other substance(s), including but not limited to, any chemical, produced water, sludge, oil-water emulsion, oilfield brine, waste oil, sediment, scale or other waste substance." Miss. Code Ann. § 53-1-3(t)(i) (1999). "Oilfield exploration and production waste" is defined in such a way as to include oilfield NORM, the subject of Rule 69.

¶37. The chancery court's opinion suggests that the requirements of Miss. Code Ann. § 53-1-17(3)(a) that the Board obtain approval of the Commission for regulations requiring the disposal of waste products was subsequently repealed by implication in 1995. This Court has consistently held that repeal of a statute by implication is not favored unless there is a plain and unavoidable repugnancy between the statutes. *Associated Press v. Bost*, 656 So.2d 113, 115 (Miss. 1995); *Roberts v. Mississippi Republican Party State Executive Comm.*, 465 So.2d 1050, 1051 (Miss. 1985); *Ex Parte McInnis*, 98 Miss. 773, 783, 54 So. 260, 262 (1910). Furthermore, statutes on the same subject, although in apparent conflict, should, if possible, be construed in harmony with each other to give effect to each. *Roberts*, 465 So.2d at 1051.

¶38. Subsections 3(a) and (7) of Miss. Code Ann. § 53-1-17 can be read in harmony. When the Board promulgates a rule regarding "the disposal of waste products" as mentioned in § 53-1-17(3)(a), the statute requires that the Board gain the approval of the Commission. Miss. Code Ann. § 53-1-17(3)(a) (1999). The Commission must approve the rule before it can become effective. However, when regulating the control of oilfield NORM when it is present in the oilfield, as is the subject of Rule 69, the Board has "exclusive jurisdiction and authority" and is not required to seek Commission approval before promulgating a rule. Miss. Code Ann. § 53-1-17(7) (1999).

¶39. In its amicus curiae brief, the Commission even acknowledged that its approval was not needed for the Oil and Gas Board to adopt Rule 69. The Commission, the agency whose interest is really at stake here, stated in its brief, "Rule 69, at issue in this litigation, is not a rule 'requiring the disposal of waste products.'" Further, it maintained that Rule 69 deals primarily with the remediation, monitoring, and human health protection requirements for oil and gas production facilities that become contaminated with NORM through the production process. The Commission acknowledged that Rule 69 does not allow for additional or new waste disposal procedures or facilities; thus, Miss. Code Ann. § 53-1-17(3)(a) does not apply. Therefore, the Chancellor was correct in holding that the Board did not err when it did not seek approval of the Commission before promulgating Rule 69.

¶40. The chancery court's opinion can be read either to hold that Rule 69 was not the type of rule (a rule regarding waste disposal) that necessitated Commission review or that the 1995 amendment to Miss. Code Ann. § 53-1-17 repealed by implication the requirement that Oil and Gas Board waste disposal rules gain Commission approval. It is this Court's view that if the Commission, the agency that handles this area and that has the most interest in this statutory interpretation, maintains that Rule 69 is not the type of rule that requires its review, then this Court cannot hold otherwise. Moreover, it is clear that the two statutory provisions are regulating different areas and, therefore, can be read in harmony. Miss. Code Ann. § 53-1-17(3)(a) specifically requires the Commission to approve Oil and Gas Board rules and regulations requiring the disposal of waste products brought to the surface from any oil, gas, or condensate well. As the Commission aptly maintained, Rule 69 does not concern disposal of waste products; rather, it concerns the control of oilfield NORM, and under Miss. Code Ann. § 53-1-17(17) the Board has exclusive authority.

¶41. The Commission must approve, per § 53-1-17(3)(a) any rules or regulations requiring disposal of waste products. However, any regulation that involves the control of oilfield NORM falls within § 53-1-17(17) and, hence, the exclusive jurisdiction of the Board. Clearly, these two subsections can be read in harmony.

## CONCLUSION

¶42. The Board's order promulgating Rule 69 was founded on substantial evidence, was neither arbitrary nor capricious, was within the authority of the Board to make, and was not a violation of some constitutional or statutory right of the complaining parties. Therefore, the judgment of the Hinds County Chancery Court is affirmed.

¶43. **AFFIRMED.**

**PITTMAN, C.J., BANKS AND McRAE, P.JJ., MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**